**UNITED STATES of America,
Plaintiff,**

v.

**SOUTHERN INDIANA GAS AND
ELECTRIC COMPANY,
Defendant.**

**IP 99–1692–C–M/F.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 13, 2003.

Steven D. Ellis, Washington, DC, Thomas E. Kieper, Indianapolis, IN, for Plaintiff.

Kevin A. Gaynor, Vison & Elkins LLP, Washington, DC, John R. Maley, Barnes & Thornburg, Indianapolis, IN, Angila M. Retherford, Vectren Corporation, Evansville, IN, for Defendant.

## ORDER ON SOUTHERN INDIANA GAS AND ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT ON FAIR NOTICE

McKINNEY, Chief Judge.

### TABLE OF CONTENTS

| | PAGE |
|---|---|
| I. BACKGROUND | 997 |
| A. RELEVANT PROVISIONS OF CLEAN AIR ACT | 997 |
| 1. New Source Performance Standards | 997 |
| 2. Prevention of Significant Deterioration | 998 |
| 3. Routine Maintenance Exemption | 998 |
| B. DISPUTE OVER SCOPE OF ROUTINE MAINTENANCE | 999 |
| C. FACTS | 999 |
| 1. SIGECO's Projects | 1000 |
| a. The 1991 Project | 1000 |
| b. The 1992 Project | 1001 |
| c. The 1997 Project | 1002 |
| 2. Public Statements about Routine Maintenance | 1002 |
| 3. Industry Letters from Utility Air Regulatory Group | 1003 |
| 4. The January 1998 Non–Applicability Determination | 1003 |
| 5. Other Projects Throughout Industry | 1004 |
| 6. Depositions from State EPA Officials | 1004 |
| II. SUMMARY JUDGMENT STANDARD | 1006 |
| III. DISCUSSION | 1007 |
| A. IS THE EPA'S INTERPRETATION REASONABLE | 1007 |
| B. FAIR NOTICE DOCTRINE | 1010 |
| C. APPLICATION OF FAIR NOTICE DOCTRINE | 1012 |
| 1. Notice Available for All Three Projects | 1013 |
| a. Notice Provided by the Routine Maintenance Exemption Language | 1013 |
| b. The WEPCO Decision | 1015 |
| 1.—Comparison of WEPCO to SIGECO'S Projects | 1016 |
| 2.—The Clay Memo | 1018 |
| 2. Additional Notice After the 1992 Project | 1020 |

a. Preamble from the Federal Register .............................1020
b. IDEM'S 1998 Non–Applicability Determination ....................1021

IV. CONCLUSION .................................................1024

This matter is before the Court on defendant Southern Indiana Gas and Electric Company's ("SIGECO") Motion for Summary Judgment on Fair Notice on the United States' ("the Government") claims that it violated the Clean Air Act ("CAA"), 42 U.S.C. § 7401, *et seq.* The parties have fully briefed their arguments, and the motion is now ripe for ruling.

## I. BACKGROUND

### A. RELEVANT PROVISIONS OF THE CLEAN AIR ACT

This motion does not require the Court to determine if SIGECO's projects actually violated the CAA. The Court need only determine whether SIGECO had fair notice of the Government's interpretation of the routine maintenance exemption. However, some discussion of the CAA provisions at issue in this case is necessary before turning to the substance of the motion.

The purpose of the CAA is "to protect and enhance the quality of Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b) (1994). To accomplish this purpose, Congress required the Administrator of the Environmental Protection Agency (the "EPA") to identify and prepare air quality criteria for air pollutants, and promulgate national primary and secondary ambient air quality standards ("NAAQS") for each pollutant. *Id.* § 7408–09. States were

then required to classify areas where the air quality was better or worse than the NAAQS for each pollutant. An area that meets the NAAQS for a particular pollutant is designated an "attainment" area, while areas that do not meet the NAAQS are called "non-attainment" areas. *Id.* § 7407(d). An area that cannot be classified due to insufficient data is "unclassifiable." *Id.* According to the Government, Culley Station, the area at issue in this action, was at all relevant times designated as either attainment or unclassifiable for the following pollutants: $SO_2$, $NO_2$, and PM/PM–10. Comp. § 17.

#### 1. New Source Performance Standards

As part of the 1970 CAA Amendments, Congress required the EPA to promulgate New Source Performance Standards ("NSPS") in order to regulate emissions from new pollution sources. These standards applied not only to newly constructed pollution sources, but also to modifications of existing sources that created new or increased pollutant emissions.[1] Indeed, Congress defined "new sources," as:

> Any stationary source, the construction *or modification* of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

42 U.S.C. § 7411(a)(2) (emphasis added). Congress defined modification as:

> *any physical change* in, or change in the method of operation of, a stationary

---

[1] The sources at issue in this action (Units 1, 2, and 3) all went into operation before the NSPS and PSD Amendments. Consequently, NSPS and PSD only apply to them if they "modified" those facilities.

source *which increases the amount of any air pollutant emitted* by such source or which results in the emission of any air pollutant not previously emitted.

42 U.S.C. § 7411(a)(4) (emphasis added).

Owners or operators of new sources are prohibited from operating those sources in violation of NSPS after the effective date of the applicable NSPS to such source. 42 U.S.C. §§ 7411, 7414. Any owner or operator of an affected facility subject to NSPS must furnish written notice to the EPA of any physical change that may increase the emission rate to which a standard applies as soon as practicable before the change is commenced. 40 C.F.R. § 60.7(a)(4).

## 2. *Prevention of Significant Deterioration Program*

In an effort to prevent the relatively unpolluted areas (attainment or unclassifiable areas) from allowing emissions to increase to the maximum levels permitted by NAAQS, Congress included the Prevention of Significant Deterioration requirements ("PSD") in the 1977 CAA Amendments. Part C of Title I of CAA, 42 U.S.C. §§ 7470–7492. § 7471, in conjunction with § 7410(a), requires states to adopt state implementation plans ("SIP") that "contain emissions limitations and such other measures as may be necessary ... to prevent significant deterioration of air quality ..." According to the applicable SIP regulations, major stationary sources in an attainment or unclassifiable area must obtain a PSD permit from the state prior to constructing a major modification. 40 C.F.R. § 52.21(I). As with NSPS, these two elements constitute a major modification (which trigger PSD): (1) any physical change; and (2) a significant net emissions increase. The PSD program also requires sources contemplating a major modification to install and operate best available control technology ("BACT"), as defined in

40 C.F.R. § 52.21(b)(12) and 42 U.S.C. § 7479(3), for each pollutant regulated under the CAA.

The Court notes that the focus of the parties in this motion is on the physical change part of the modification definition. The parties have not briefed the issue of whether or not emissions have increased as a result of SIGECO's projects. Of course, the EPA has the burden to prove that SIGECO's projects satisfy *both* prongs of the CAA modification definition. When analyzing whether or not a project amounts to a modification, the most important difference between NSPS and PSD is the method by which the respective programs measure emissions. For the NSPS program, the EPA must determine whether a change increases the *hourly rate of emissions* at a facility. 40 C.F.R. § 60.14. For the PSD program, on the other hand, the EPA regulations provide that an increase in the *total amount of annual emissions* activates the modifications provisions. 40 C.F.R. § 52.21(b)(3). In short, the crucial issue of whether or not emissions have increased as a result of the SIGECO's projects remains an open question after this motion.

## 3. *Routine Maintenance Exemption*

As the Seventh Circuit observed in a landmark CAA decision, the definition of "any physical change" is broad: "Even at first blush, the potential reach of these modification provisions is apparent: the most trivial activities—the replacement of leaky pipes, for example—may trigger the modification provisions if the change results in an increase in the emissions of a facility." *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 905 (7th Cir.1990) ("WEP-CO"). However, both NSPS and PSD contain a regulatory exemption to the "physical change" definition that may be relevant in this case. 42 C.F.R. § 52.21(b)(2)(iii) provides:

(iii) A physical change or change in the method of operation shall not include:

(a) Routine maintenance, repair, and replacement.

40 C.F.R. § 52.21(b)(2)(iii) (PSD program); *see* 40 C.F.R. § 60.14(e) (NSPS program). These regulations, and the statutes from which they derive, are the crux of this case.[2]

## B. DISPUTE OVER SCOPE OF ROUTINE MAINTENANCE

To provide context for the evidence offered by the parties on the fair notice motion, the Court will first briefly outline the parties' positions. The Government claims that SIGECO's projects in 1991, 1992, and 1997 (the "projects") violated the CAA because they were modifications that triggered NSPS and PSD permitting and BACT provisions. As stated above, neither NSPS nor PSD is triggered unless the projects were (1) physical changes that (2) increased emissions. SIGECO attacks the physical change element by arguing that all of its projects were routine maintenance, repair, and replacement, and thus exempt from the definition of physical change. The Government maintains that the routine maintenance exemption does not apply to any of SIGECO's projects.

Thus, a central issue in this case is the proper interpretation of the routine maintenance exemption. SIGECO does not dispute that the routine maintenance exemption analysis entails a fact intensive, case-by-case determination, taking into account factors such as the project's nature, extent, frequency, and cost. *See* SIGECO Memo in Opposition to Government's Motion for Summary Judgment on Applicable Legal Test for Routine Maintenance at 7 ("With this basic articulation of the factors that bear on the 'routine' evaluation, SIGECO has no quarrel."). Instead, the parties primarily quarrel over the scope of the frequency factor within the routine maintenance analysis.

The EPA argues that it has always looked at the unit itself to determine if these types of modifications occurred frequently in the maintenance of the unit. In other words, in addressing the frequency factor of routine maintenance, the EPA would look specifically at, for example, Culley Station Unit 3 to see if the types of changes made in 1997 had occurred frequently in the history of Unit 3. SIGECO, on the other hand, strongly disagrees and asserts that the EPA has always looked at the utility industry as a whole to see if the types of activities taken at a particular unit are done frequently across the industry. In SIGECO's view, even if a project is unprecedented in the life of a unit, it still could qualify for routine maintenance if other utility companies have taken on similar projects. Thus, SIGECO offers evidence below in support of its claim that the EPA has recently changed its view of routine maintenance, and, more specifically, the frequency factor, and maintains that it did not have fair notice of the EPA's "new" interpretation.

## C. FACTS

In this enforcement action, the Government alleges that SIGECO made CAA modifications on three separate occasions: (1) a 1991 project at Culley Station Unit 1; (2) a 1992 project at Culley Station Unit 2; and (3) a 1997 project at Culley Station

---

**2.** The acronym "NSR" is used to refer to the EPA's New Source Review programs. In the Court's review of the evidence, it appears that NSR is often used to refer to both NSPS and PSD. Although there are important differences between the two programs (for example, they measure emissions increases differently), the Court, like the parties, will use NSR to refer to both PSD and NSPS, or refer to them individually as necessary.

Unit 3. According to the Government, all three projects violated the PSD requirements, and the 1997 project also violated NSPS. The Government requests fines for these violations[3], and injunctive relief to bring them into compliance with PSD and NSPS.[4]

### 1. *SIGECO's Projects*

#### a. The 1991 Project

The F.B. Culley Station Unit 1 boiler began its initial operation in approximately 1955. Pl.'s Stmt. of Facts ¶ 12. Unit 1 contains a large, tubular heat exchanger, called an economizer, at the rear of the convection pass section of the boiler. *Id.* ¶ 13. The Unit 1 economizer contained two horizontal banks of tubes, identified as the inlet bank (lower) and the outlet bank (upper). *Id.* ¶ 14. The inlet and outlet banks each contained 78 tube elements with an approximate total 9,224 square feet of heating surface. *Id.* B.J. Reynolds ("Reynolds"), the Plant Manager at the time, testified that, to the best of his knowledge, the 1991 project was the first time the economizer had been replaced since it began operation in 1955. Reynolds Dep. at 62–64.

On April 8, 1988, Reynolds notified the Director of Power Production that the economizer "has problems," referring to the results of a Life Extension Boiler Study, and he stated the need to budget for and purchase a new economizer for the next year. *Id.* ¶ 22. Problems with economizer tube repairs (plugs) began to occur and it was necessary to re-plug or repair leaking plugs in some of the header openings. *Id.*

¶ 24. In February 1990, SIGECO initiated a capital work order to replace the economizer. *Id.* ¶ 25. SIGECO projected the cost of the economizer replacement at $750,000, including material, labor to remove the old materials, and labor to install the new materials.[5] *Id.* ¶ 26.

In a letter dated May 21, 1990, Babcock and Wilcox provided a quotation to SIGECO, its third, for a replacement economizer. *Id.* ¶ 27. The proposal included increasing the 0.150 inch tubing wall thickness to a 0.165 inch minimum wall. *Id.* ¶ 28. The Babcock and Wilcox price proposal was to replace all economizer tubing from a cut line 6–inches from the inlet header to a cut line 6–inches from the outlet header at a cost of $256, 500.00. *Id.* ¶ 29.

SIGECO prepared a specification for the Unit 1 economizer replacement. *Id.* ¶ 30. The job was to be performed during a scheduled four-week outage from March 18, 1991, to April 12, 1991. *Id.* The specification stated that some of the tube bundles that had been plugged are cut off too close to the header for connection with the new tubes. *Id.* These required new stub pieces to be bent and rolled into the header. *Id.* Within SIGECO, the Unit 1 economizer replacement required the approval of Plant Manager Reynolds, Director of Power Production Gary Gress ("Gress"), and company President Norm Wagner. *Id.* ¶ 31.

When asked about when the Culley Station units would be at the end of their useful lives, Gordon Hurst, the former President and Chief Operating Officer of

---

**3.** Due to this Court's ruling in a prior motion, civil penalties are no longer available for the 1991 and 1992 projects. *See* Doc. No. 317 (granting SIGECO's Motion for Partial Summary Judgment on the Statute of Limitations).

**4.** The parties have made numerous evidentiary objections to evidence offered for this mo-

tion, and many of the objections merit extended discussion. Accordingly, the Court created an Appendix for the evidentiary issues, and attached the Appendix to the order.

**5.** The actual cost of the project was $575,000.

SIGECO ("Hurst"), responded that SIGECO "never tried to predict" when its plants would wear out. Def.'s Ex. 43. According to Hurst, SIGECO believes that it can operate its plants "indefinitely" and the life of the facilities is "indefinite." Def.'s Ex. 43.

### b. The 1992 Project

The Culley Station Unit 2 boiler began its initial operation around 1966 or 1967. Pl.'s Stmt. of Facts ¶ 39. Unit 2 contains a large, tubular heat exchanger, called a secondary superheater. *Id.* ¶ 40. The secondary superheater contains two headers, an inlet and an outlet. The headers are long sections of large pipe. *Id.* The outlet header is approximately 33 to 35 feet long, closed on each end. *Id.* Reynolds testified that Unit 2 was experiencing an extremely high failure rate in the tubing in the outlet section of the secondary superheater prior to its replacement. *Id.* ¶ 44. When asked whether the secondary superheater had been replaced before 1992, Hurst stated that he was not aware of any such replacement. *Id.* ¶ 43.

Babcock & Wilcox, a company that evaluated the condition of the Culley Station units and eventually performed the replacements, recommended replacement of the Unit 2 secondary superheater. *Id.* ¶ 46. SIGECO initiated a capital work order in October 1991 for the replacement of the outlet section of the secondary superheater tubes and the outlet header. *Id.* ¶ 48. The work order projected the cost[6] of the replacement project to be $1,035,000.00, including the cost of the materials and labor for the removal of the old materials and installation of the new materials. *Id.* The description of work in the work order was as follows:

Purchase and install new outlet section of secondary superheater on F.B. Culley Station Unit # 2. Included is the outlet header and outlet tube bundles. An extremely high failure rate on these tubes has occurred. Tube samples taken from the outlet bundles show no remaining life.

Work Order 2101202, SIG 0011984, Pl.'s Ex. 65. Within SIGECO, the Unit 2 secondary superheater replacement required the approval of Plant Manager Reynolds, Director of Power Production Gress, Vice President Hurst, and company President Rehrman. Pl.'s Stmt. of Facts ¶ 53.

The new secondary superheater outlet tube elements (43 total) were assembled at the Babcock & Wilcox facility and shipped to the site. *Id.* ¶ 54. There were three different element arrangements and the approximate weights of the respective elements were 475 pounds (1 element), 900 pounds (21 elements), and 1,375 pounds (21 elements), for a total weight of 48,250 pounds. *Id.* The overall dimensions of the secondary superheater outlet section were approximately six feet by 11.5 feet by 33 feet. *Id.* ¶ 55. The materials for the new outlet section tube elements and the outlet header were of a higher alloy than the original materials; the new, higher alloy would provide longer life than the original materials. Pl.'s Stmt. of Facts ¶ 51. The header material was upgraded from PI I material to a P22 alloy and the stub hole arrangement was ungraded to the current Babcock and Wilcox axial penetration arrangement. *Id.* The types of alloys used in the secondary superheater outlet bank were reduced from four to two, eliminating many dissimilar welds and reducing the amount of material required for spare parts. *Id.* The upper tubes in the outlet bank were fabricated from SA–213–T22 and the lower tubes from SA213–T2. *Id.* Babcock and Wilcox's quotation also stated

---

6. The actual cost of the project at Unit 2 was $1,014,722.00. Pl.'s Ex. 72.

that the tube wall thicknesses were changed as well:

> We are proposing to perform an engineering study as part of the material supply which would modify the material in the sections and headers. The engineering study would determine the thicknesses of the replacement materials to maintain the unit integrity.

Pl.'s Ex. 62.

### c. The 1997 Project

The 1997 project at Culley Station Unit 3 was the largest of SIGECO's projects. *See* Pl.'s Stmt. of Facts on its Motion for Summary Judgment that Unit 3 Project Does Not Qualify for Routine Maintenance (all of the facts about the 1997 project are taken from that statement of facts). The project included the following: "(1) replacement of superheater outlet; (2) replacement of the reheater outlet; (3) install aero-derivative high pressure-intermediate pressure turbine; (4) replace boiler feed pump element; (5) replace low pressure turbine buckets; and (6) installing retractable packing in the turbine." SIGECO's Vice–President of Power Production concluded that the future reliable operations were in jeopardy prior to the project. The project cost $17 million and required a ten-week outage to complete. SIGECO's parent, SIGCORP, referred to the project as a "major refurbishment." It was the first time the reheater outlet had been replaced since the Unit began operating in 1973.

### 2. *Public Statements by the EPA about Routine Maintenance*

In a June 19, 1991, letter from William Rosenberg, then Assistant EPA Administrator, to Senator John Dingell, Rosenberg stated: "EPA's WEPCO decision only applies to utilities proposing 'WEPCO type' changes, i.e., nonroutine replacement that would result in an actual emissions in-

crease. This is the basis for the EPA statement that the ruling is not expected to significantly affect power plant life extension projects." *Id.* ¶ 22.

In 1992, the EPA promulgated a rule to clarify the emissions test applicable to utility generating units, and that rule was preceded by a preamble. The preamble provides in pertinent part:

> A few commenters requested that EPA define or provide guidance on 'routine repair, replacement, and maintenance' activities. The June 14 proposal did not deal with this aspect of the regulations, nor do the regulatory changes promulgated today. However, the issue has an important bearing on today's rule because a project that is determined to be routine is excluded by EPA regulations from the definition of major modification. For this reason, EPA plans to issue guidance on the subject as part of a NSR regulatory update package which EPA presently intends to propose by early summer. In the meantime, EPA is today clarifying that the determination of whether the repair or replacement of a particular item of equipment is 'routine' under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category.

57 Fed.Reg. 32,316, *32326.

In 1995, Mary Nichols, EPA's Assistant Administrator for Air Programs, responded to a number of questions posed by industry representatives about the CAA. Among other issues, industry requested a new "restoration" exclusion that would for "activities that restore a unit to the highest capacity achievable in the previous five years." Under industry's proposal, these activities would not be considered modifications, and, consequently, would not trig-

ger NSR requirements. The EPA responded:

> EPA believes the issue of how restoration of lost capacity should be treated for NSR applicability purposes is better resolved by the PAL, the Clean Unit Test, and other mechanisms in the NSR Reform package that provide sources with considerable flexibility to make changes. EPA believes that the routine maintenance exclusion already included in the existing NSR regulations also has the effect of excluding 'routine restorations.'

Def.'s Ex. 13 at 19.

On January 26, 1996, John Seitz, the EPA's Director of Air Quality Planning and Standards wrote to Senator Robert Byrd about "potential revisions to the new source performance standards (NSPS) limiting nitrogen oxides (Nox) emissions . . ." Def.'s Ex. 12. The letter provides in pertinent part:

> Another concern you expressed was the potential impact of the revision on existing units. Under the General Provisions (40 CFR 60, subpart A) for new source performance standards, an affected facility is defined as a unit which commences construction, modification, or reconstruction after the date of proposal. To date, no existing unit has become subject to the utility NSPS under either the modification or reconstruction provision. Since it is anticipated that no existing utility unit will become subject to the revision due to being modified or reconstructed, as defined under the general provisions, no change to the applicability of the revision is currently planned for this rulemaking.

Def.'s Ex. 12 at 4.

### 3. *Industry Letters from Utility Air Regulatory Group to the EPA*

Between 1989 and 1990, the Utility Air Regulatory Group ("UARG") wrote three letters to the EPA about the NSR program and WEPCO. In a 1989 letter, UARG wrote to Department of Energy ("DOE") about what UARG viewed as the consequences and problems surrounding the EPA's decision (the Clay Memo) in WEPCO. The letter requested that the EPA Administrator reconsider the WEPCO interpretations because of the negative impact it would have on energy policy and the economy. Regarding the routine maintenance exemption, the UARG wrote:

> EPA's decisions acknowledge that "routine" repairs and replacements are not subject to the NSPS and PSD modification rules. However, the Agency has arbitrarily redefined what repair and replacement activities are, such that "routine" activities include only those that (1) are frequently done at that plant, (2) involve no major equipment, (3) are inexpensive, and (4) do not extend the life of a plant. This new interpretation is vastly different from past implementation of the "routine" rule, which included any repair and replacement activity that is normal business practice.

Pl.'s Ex. 73 at UARG1 0000095.

UARG also wrote a letter to the EPA in January 1990, which was after the EPA issued the Clay Memo but before the Seventh Circuit issued its WEPCO opinion (the appeal from the Clay Memo). Pl.'s Ex. 21. This letter focused on the policy implications of the EPA's "recent activist" view of the NSR programs. The letter did not specifically construe the routine maintenance exemption, but generally implied that the EPA was expanding the NSR program.

### 4. *The January 1998 Non–Applicability Determination*

SIGECO contacted Indiana Department of Environmental Management ("IDEM")

about the 1997 project at issue in this case, and provided IDEM with information about the project. SIGECO argued that neither NSPS nor PSD would apply to the project. Pl.'s Ex. 20. On January 27, 1998, IDEM sent SIGECO a non-applicability letter (i.e., the project would not trigger NSPS or PSD). The letter provides:

> IDEM has determined that these activities will not trigger Clean Air Act requirements under the prevention of significant deterioration (PSD) nor the new source performance standards (NSPS) programs.... Based on the data presented, we concur with SIGECO that the maintenance activities proposed for Culley Unit 3 will not trigger the requirements under NSPS or PSD. Specifically, we have determined that the replacement of the existing steam tubes and turbine blades can be considered a "like-kind replacement" under 326 IAC 2–2–1 for purposes of PSD. Additionally, this activity by SIGECO falls under the "maintenance, repair, and replacement" exemption for 326 IAC 12–1 for NSPS.... No permit review is necessary at this time for either prevention of significant deterioration or new source performance standards.

Def.'s Ex. 36.

### 5. *Other Projects Throughout Industry* [7]

In 1988, Mobil Oil Corporation ("Mobil") requested an NSPS determination about a proposed replacement of regenerator cyclones and other renovation work. After reviewing materials that described the project, Kenneth Eng, the Chief of the EPA's Air Compliance Branch, informed Mobil that the project did constitute routine maintenance, and, consequently, would not be considered a modification that would trigger NSPS. The estimated cost of the renovation work was $2.57 million.

In 1988, the EPA determined the Wisconsin Electric Power Company's ("WEPCO") Port Washington Life Extension Project triggered PSD and NSPS. Def.'s Stmt. of Facts ¶ 19. At the end of an investigation regarding the EPA's WEPCO determination, the General Accounting Office ("GAO") reported that "[a]ccording to EPA policy officials, WEPCO's life extension project is not typical of the majority of utilities' life extension projects, and concerns that the agency will broadly apply the ruling it applied to WEPCO's project are unfounded. The officials noted that many life extension projects do not result in increased emissions, while other activities are routine in nature and thus exempt from the modification rule." *Id.* ¶ 20. Gordon Hurst testified that SIGECO was aware of the statements made in the GAO report. *Id.* ¶ 21.

### 6. *Depositions from State EPA Officials*

SIGECO obtained depositions [8] from three state EPA officials who expressed

---

**7.** SIGECO offers a Tennessee Valley Authority ("TVA") report that sampled a number of units in the utility industry to determine how often certain projects take place throughout industry. If the report is indeed admissible, the Court considers it relevant to whether SIGECO's projects actually qualify for routine maintenance, which is not the Court's task on this Motion. Accordingly, the Court defers ruling on its admissibility.

**8.** Some of these state officials also wrote letters to the EPA about these issues, but the officials' deposition testimony is essentially the same. The Government objects to the deposition testimony as irrelevant. However, in light of the state/EPA partnership in enforcing the CAA and the state environmental agencies' primary permitting authority for CAA programs, the Court considers this testimony relevant. These state officials deal with utility companies frequently—for example,

views on how the EPA is interpreting routine maintenance. The following highly-placed state EPA officials were deposed: John M. Daniel of Virginia ("Daniel"); Justin P. Wilson of Tennessee ("Wilson"); and George Meyer of Wisconsin ("Meyer").

Daniel, the Director of Air Program Coordination for Virginia's Department of Environmental Quality, testified that, "it appeared to me this approach [to routine maintenance and replacement] was entirely different than what EPA had been historically using over the last twenty or so years." Def.'s Ex. 5 in support of Supplemental Brief in Support of Fair Notice Motion, Daniel Depo. at 18. Daniel wrote a letter to the EPA about this issue because: "I just wanted to get on the record I was expressing concern at what appeared to me to be a 180 degree turn from what the EPA had done historically. And I thought if they were gonna do that, they ought to give people notice, other than filing enforcement actions." Daniel Depo. at 20. When asked to define the 180 degree turn by the EPA, Daniel responded:

Well, prior to this happening, I was not aware of any circumstance where EPA had charged a utility for violating the PSD New Source Review Regulations for what appeared to be routine maintenance, replacing boiler tube, turbine blades, or superheaters or economizers, any of those things. I think this has been going on for years. And to my knowledge, EPA has never complained about it until all of a sudden in 1999 they decided they were gonna do that [initiate enforcement actions like the instant one].

*Id.* When questioned by the Government about what he based his statements on,

Daniel said he did not base them on any past written EPA guidance, but on his "perception of what had historically been done or not done, as the case may be . . . . actions speak louder than words." Pl.'s Ex. F in Support of its Opposition to Def.'s Supp. Arguments on Fair Notice, Daniel Depo. at 66–67.

Wilson is the Deputy Governor for Policy for the State of Tennessee. Wilson Depo. at 7. In describing his responsibilities regarding environmental issues, Wilson testified: "Subject to the governor's direction and approval, I think I'm the primary person responsible for the environmental policies of the State of Tennessee." *Id.* at 8. Wilson stated: "EPA reinterpreted NSR requirements to find that many common maintenance repair and replacement projects at utilities and other industries should be subject to the lengthy NSR permitting process." *Id.* at 18. Wilson and his staff believed that the rules were being changed by EPA with respect to the NSR requirements. *Id.* at 20. Wilson also stated, "Under its reinterpretation of NSR in the previous administration, the U.S. Environmental Protection Agency believes that all but the very simplest of repairs and routine maintenance at electric utilities cannot be made without triggering costly and unfair retrofit controls to reduce pollutants." *Id.* at 23. Wilson also testified that he did not personally have experience in determining the applicability of routine maintenance provisions under the NSR program as applied to existing coal-fired power plants. Pl.'s Ex. E in Opposition, Wilson Depo. at 45. Although he stated that the EPA's current interpretation of routine maintenance and NSR was a "radical reinterpretation," he stated that

whenever the companies request NSR determinations, the state agencies, like IDEM, have to interpret EPA regulations and then make applicability decisions. Thus, the testimony is

relevant to the extent it illustrates inter-agency confusion about routine maintenance and NSR.

he did not really understand the EPA's current position, and he did not remember the holding of WEPCO. *Id.* at 54–56, 63–66.

George Meyer was Secretary of the Wisconsin Department of Natural Resources from February 1993 until February of 2001. Meyer Depo. at 7. Meyer was troubled by the "retroactive enforcement" of this enforcement initiative. *Id.* at 21. Meyer continued:

> Guidance had been given by the delegated agency, ourselves, based on what our—what we thought the regulations and guidance to be and that we thought that was informed advice, informed advice because our people had gone through training from U.S. EPA on this. And in some cases, in individual decisions, specific concurrence had been given by U.S. EPA, and to go back and question those decisions and then base an enforcement action on it troubled me. As I headed our enforcement division for a dozen years, that's something that I clearly was troubled by.

*Id.* at 21–22. Meyer did not have any experience evaluating whether or not a project at a coal-fired power plant would be classified as routine maintenance under PSD or NSR. Pl.'s Ex. D in Opposition, Meyer Depo. at 47.

## II. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir.1990), *cert.*

*denied*, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir.1996), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548;

*Shields Enters., Inc. v. First Chi. Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir.1996), *cert. denied,* 519 U.S. 1109, 117 S.Ct. 945, 136 L.Ed.2d 834 (1997). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir.1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992). "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir.1996), *cert. denied,* 519 U.S. 1115, 117 S.Ct. 957, 136 L.Ed.2d 843 (1997).

## III. *DISCUSSION*

### A. IS THE EPA'S INTERPRETATION REASONABLE?

The routine maintenance exemption is found in the CAA regulations promulgated by the EPA pursuant to a Congressional grant of authority, and "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of

an agency." *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Courts defer even more to an agency's construction of its own regulations. *See Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986); *WEPCO,* 893 F.3d at 907. *See also Homemakers N. Shore, Inc. v. Bowen,* 832 F.2d 408, 411 (7th Cir.1987) ("An agency's construction of its own regulations binds a court in all but extraordinary circumstances."). This is especially true when the subject is a complex or technical one like the CAA. *See Chevron,* 467 U.S. at 848, 104 S.Ct. 2778 ("The Clean Air Act Amendments of 1977 are a lengthy, detailed, technical, complex, and comprehensive response to a major social issue.").

The recent Supreme Court decision in *Mead* also informs this analysis. *See United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). *Mead* alerts courts that "deference to agency positions is not an all-or-nothing proposition; more informal agency statements and positions receive a more flexible respect, in which factors like 'the degree of the agency's care, its consistency, formality, and relative expertness, and ... the persuasiveness of the agency's position,' are all relevant." *U.S. Freightways Corp. v. C.I.R.,* 270 F.3d 1137, 1141 (7th Cir. 2001) (quoting *Mead,* 121 S.Ct. at 2171).

In many cases, the focus of the court is on the deference it must give to a regulation itself. In this case, the validity of the routine maintenance regulatory exemption is not at issue. In fact, SIGECO is claiming the benefit of that exemption. Thus, the Court must determine whether the EPA's interpretation of the regulation is reasonable.[9] *See U.S. Freightways,* 270

---

9. The parties have more fully briefed this issue in the United States' Motion for Summary

Judgment on the Applicable Legal Test for Routine Maintenance and Thirteen Affirma-

F.3d at 1141 (observing that if the validity of the regulation itself is not at issue, the issue becomes whether the administrative agency's interpretation of its own regulations is reasonable).

The NSR programs are triggered by (1) modifications (any physical change) that (2) increase pollutant emissions. Routine maintenance projects (even if they increase emissions) are exempt from the CAA's definition of modification:

> The following shall not, by themselves, be considered modifications under this part:
>
> (1) Maintenance, repair, and replacement which the Administrator determines to be routine for a source category ...

40 C.F.R. § 60.14(e) (1988) (NSPS program); *see* 40 C.F.R. § 52.21(b)(2)(iii) (1988) (PSD program).[10] SIGECO agrees with the Government that the routine maintenance analysis entails a fact intensive, case-by-case determination, taking into account factors such as the project's nature, extent, frequency, and cost. However, SIGECO takes issue with how the EPA interprets the frequency factor in the routine maintenance inquiry.

The EPA asserts that it has always looked at the unit itself to determine if these types of modifications occurred frequently in the maintenance of the unit. In other words, in addressing the frequency

factor of routine maintenance, the EPA would look specifically at, for example, Culley Station Unit 3 to see if the types of changes made in 1997 had occurred frequently in the history of Unit 3. The Government argues:

> The interpretation EPA urges in this case is the same interpretation that the Seventh Circuit upheld more than a decade ago in *Wisconsin Electric Power Co. v. Reilly,* 893 F.2d 901 (7th Cir.1990) ("WEPCO"). This interpretation has three hallmarks. First, the exemption applies to a narrow range of activities, in keeping with EPA's limited authority to exempt activities from the Clean Air Act. *Second, the exemption applies only to activities that are routine for a generating unit. The exemption does not turn on whether the activity is prevalent within the industry as a whole.* Third, no activity is categorically exempt. EPA examines each activity on a case-by-case basis, looking at the nature and extent, purpose, frequency, and cost of the activity.

Pl.'s Opposition to Def.'s Motion for Summary Judgment on Fair Notice at 1 (emphasis added).

SIGECO contends that the second "hallmark" above, where the EPA submits that the exemption applies only to activities that are routine for a generating unit and

---

tive Defenses. The Court believes that the "Applicable Legal Test for Routine Maintenance" portion of that motion is more appropriately and efficiently decided together with this Motion on whether or not SIGECO had fair notice of the EPA's interpretation of routine maintenance. As the parties have incorporated arguments by reference from one motion to another, the Court has considered the parties' arguments from the Motion on the Applicable Legal Test for Routine Maintenance in conjunction with this issue. The Court will rule separately on the "Thirteen Affirmative Defenses" portion of that motion.

10. Although the routine maintenance language in the PSD and NSPS programs is not exactly the same, it does not appear that the EPA intended any difference in interpretation between the exemptions as they apply to the NSR programs. Neither EPA nor SIGECO has addressed or interpreted them separately or differently in the briefs, and past cases and pronouncements by the EPA do not differentiate between them. Accordingly, the Court will address them together.

does not turn on whether an activity is prevalent in the industry as a whole, is a new interpretation of routine maintenance advanced for the first time in this litigation. Rather than applying the exemption only to activities that are routine for a generating unit, SIGECO asserts that the EPA has always looked at the utility industry as a whole to see if the types of activities taken at a particular unit are done frequently across the industry. In SIGECO's view, even if a project is unprecedented in the life of a unit, it still qualifies for routine maintenance if other utility companies have taken on similar projects. Because of this disagreement over how the EPA has interpreted routine maintenance, and, more specifically, the frequency factor, SIGECO maintains that it did not have fair notice of the EPA's "new" interpretation. SIGECO argues that this narrow interpretation of routine maintenance would subject numerous utilities to the costly NSR requirements.

The Court concludes that the EPA's interpretation of routine maintenance is reasonable and persuasive, and will defer to it in this litigation. Although routine maintenance is not defined in the regulations, the EPA's narrow interpretation is consistent with the plain language of the regulation. The EPA did not exempt "repair, maintenance and replacement;" it exempted *"routine* repair, maintenance and replacement." As the Environmental Appeals Board ("EAB") observed, "even without a benefit of context, the use of the word "routine" puts the reader on notice that irregular or unusual activities may not qualify." *See In re Tennessee Valley Authority,* Docket No. 00–6, 2000 WL

1358648, *34 (EPA ALJ Sept. 15, 2000) (*"In re TVA"*).[11]

■ In addition, the CAA term "modification" was defined very broadly by Congress, as "any physical change" that increases emissions. In WEPCO, the Seventh Circuit observed, "the potential reach of these modification provisions is apparent: the most trivial activities—the replacement of leaky pipes—for example—may trigger the modification provisions if the change results in an increase in the emissions of the facility." *WEPCO,* 893 F.2d at 905. The routine maintenance exemption was subsequently promulgated by the EPA in its CAA regulations, and it exempted routine changes at regulated facilities from the broad definition of modification. Giving the routine maintenance exemption a broad reading could postpone the application of NSR to many facilities, and would flout the Congressional intent evidenced by its broad definition of modification. The EAB clearly elucidated this concern in *In re TVA:*

> If TVA can, under cover of routine maintenance, repair or replacement, undertake significant, emissions-increasing overhauls of its existing facilities without modernizing pollution controls simply because others in the industry have undertaken like projects, then the CAA's grandfathering of TVA's units in 1977 becomes, in effect, a permanent status.

*In re TVA* at *23. How often similar projects are undertaken throughout industry may inform the analysis, but Congress certainly did not intend to allow for companies to make an "end run" on NSR by allowing the routine maintenance exemption to swallow the modification rule. As

**11.** Because the EAB opinion does not have page numbers, the Court will refer to the page number of the printed out Westlaw version to give the parties an estimation of where the cited material is found. An appeal from the EAB decision is currently pending before the Eleventh Circuit.

the Seventh Circuit reasoned in WEPCO, provisions in the CAA should not be interpreted in a way that "would open vistas of indefinite immunity from the provisions of NSPS and PSD." *WEPCO,* 893 F.2d at 909.

■ The vast expertise of the EPA in this highly technical and specialized area also suggests that deference is appropriate in this case. *See Mead,* 121 S.Ct. at 2171 (holding that an agency's relative expertness is relevant when considering whether to give deference to an agency's position). As the court commented in *General Electric,* "[p]articularly in the context of this comprehensive and technically complex regulatory scheme, EPA's interpretation of the regulations is permissible.... We defer to the reasonable judgment of the agency to which Congress has entrusted the development of rules and regulations to ensure its safe disposal." *Gen. Elec. Co. v. United States Envtl. Prot. Agency,* 53 F.3d 1324, 1328.

Congress enacted the CAA to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again." H.R.Rep. No. 1146, 91st Cong., 2d Sess. 1,1, 1970 U.S.Code Cong. & Admin. News 5356, 5356. Congress entrusted the EPA with the authority to further define and enforce these lofty goals, and the EPA's interpretation of routine maintenance is reasonable and consistent with those goals. Thus, the Court will defer to the EPA's judgment in interpreting the routine maintenance exemption.

## B. FAIR NOTICE DOCTRINE

■ The fair notice doctrine, however, prevents this deference shown to agency interpretations from "validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires." *Gates & Fox Co., Inc. v. Occupational Safety and Health Review Comm'n,* 790 F.2d 154, 156 (D.C.Cir.1986). Though this principle arises most often in the criminal context, the fair notice concept has been recognized in the civil administrative context, and is now thoroughly incorporated into administrative law. *See Satellite Broad. Co. v. FCC,* 824 F.2d 1, 3 (D.C.Cir. 1987). *See also Trinity Broad. of Fla., Inc. v. Fed. Communications Comm'n,* 211 F.3d 618 (D.C.Cir.2000); *United States v. Chrysler Corp.,* 158 F.3d 1350 (D.C.Cir. 1998); *United States v. Hoechst Celanese Corp.,* 128 F.3d 216 (4th Cir.1997); *Gen. Elec.,* 53 F.3d 1324 (D.C.Cir.1995); *Beazer East, Inc. v. United States Envtl. Prot. Agency, Region III,* 963 F.2d 603 (3rd Cir.1992); *Rollins Envtl. Services, Inc. v. EPA,* 937 F.2d 649 (D.C.Cir.1991); *Fluor Constructors, Inc. v. Occupational Safety and Health Review Comm'n,* 861 F.2d 936 (6th Cir.1988); *Tex. E. Prods. Pipeline Co. v. Occupational Safety and Health Review Comm'n,* 827 F.2d 46 (7th Cir.1987); *Metro–East Mfg. Co.,* 655 F.2d 805 (7th Cir. 1981); *Kropp Forge Co. v. Sec'y of Labor,* 657 F.2d 119 (7th Cir.1981); *Diamond Roofing Co. v. OSHRC,* 528 F.2d 645 (5th Cir.1976).

■ The fair notice doctrine (also called fair warning) in the administrative context is a developing concept of relatively recent vintage.[12] The Fifth Circuit began the line

---

**12.** Although the fair notice doctrine has its roots in the Due Process Clause's void-for-vagueness doctrine, it has arguably expanded beyond its constitutional underpinnings. *See* Kieran Ringgenberg, *United States v. Chrysler: The Conflict Between Fair Warning and Adju-*

*dicative Retroactivity in D.C. Circuit Administrative Law,* 74 N.Y.U. L.Rev. 914 (1999). In an early fair notice opinion, then-Judge Scalia explicitly linked the doctrine to the Due Process Clause. *See Gates,* 790 F.2d at 156 (Scalia, J.). However, in a subsequent fair notice

of case law on fair notice when it reversed an administrative court's conclusion that the defendant had violated an OSHA regulation, holding that the defendant did not have fair warning of how OSHA was interpreting the regulation at issue. *See Diamond Roofing*, 528 F.2d at 649–50. In an oft-cited passage, the court held, "If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express ... [the agency] has the responsibility to state with ascertainable certainty what is meant by the standards he has promulgated." *Id.* at 649 (citations omitted). The bulk of the fair warning case law comes from the D.C. Circuit, which stated the test this way: "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *Gen. Elec.*, 53 F.3d at 1329. The inquiry is taken from the perspective of the regulated party (not the agency), and analyzes whether that party could have predicted the agency's interpretation of the regulation at the time of the conduct at issue. *See Hoechst Celanese*, 128 F.3d at 224–230.

 Although the degree of ambiguity required for a regulation to violate fair notice is unclear, courts have considered a number of factors to be relevant guides in the inquiry. In some cases, the plain language of the regulation may suffice to show fair notice or a lack thereof. *See,*

*e.g., Gates,* 790 F.2d at 156 (Scalia, J.) (focusing on the actual language of the regulation at issue to conclude that defendant did not have fair notice of OHSA's interpretation). Other public statements by the agency are also relevant to the fair notice inquiry. *See Gen. Elec.,* 53 F.3d at 1329 (stating that notice can come from "regulations and *other public statements* issued by the agency.") (emphasis added). The consistency of those public statements is also surely relevant. *See Sekula v. Fed. Deposit Ins. Corp.,* 39 F.3d 448, 457 (3rd Cir.1994) (concluding that agency's longstanding, consistent, public interpretation of regulation provided defendant with fair notice); *Fed. Election Comm'n v. Arlen Specter '96,* 150 F.Supp.2d 797, 814 (E.D.Pa.2001) (reasoning that although actual language of regulation was ambiguous, numerous public statements that clearly and consistently stated agency's interpretation provided defendant with fair notice). An "agency's pre-enforcement efforts to bring about compliance ... [may also] provide adequate notice." *Gen. Elec. Co.,* 53 F.3d at 1329. Confusion within the enforcing agency as to the proper interpretation of a regulation is also relevant evidence to show a lack of fair notice. *See id.* at 1332 (recognizing that it is unlikely that defendant had fair notice when some EPA regional offices had agreed with the defendant's interpretation of the regulation). *See also Rollins,* 937 F.2d at 653 (observing that "significant disagreement existed between EPA's regional offices regarding proper interpretation of language"). Whether or not a confused defendant makes inquiry about the meaning of the regulation at issue is also relevant. *See,*

---

case, Chief Judge Edwards of the D.C. Circuit called the fair notice rule a nonconstitutional principle of "basic hornbook law in the administrative context." *Rollins,* 937 F.2d at 649, 654 n. 1 (Edwards, J., dissenting in part and concurring in part). Because of this dis-

agreement and because there is a growing body of administrative cases on fair notice, the Court will, to the extent possible, focus on fair notice case law rather than the void-for-vagueness case law to which the Government cites.

e.g., *Tex. E. Prods. Pipeline Co.*, 827 F.2d at 50 (finding fault with company's failure to make any inquiry of the administrative agency responsible for the regulations at issue).

## C. APPLICATION OF FAIR NOTICE DOCTRINE

■ The posture of this case is different than the majority of fair notice cases. In many of the cases, an administrative agency issues a violation to a regulated party, and then an administrative hearing is held. Then, the regulated party files a petition for a review of the administrative order (that came from the hearing) in the appropriate Court of Appeal. *See, e.g., Gates*, 790 F.2d at 154; *Diamond Roofing*, 528 F.2d at 645. Usually, the regulated party is challenging the agency's interpretation of the actual regulatory language that the agency argues established a violation.

In the instant case, on the other hand, there was no administrative history—the filing of this suit was the EPA's first action against SIGECO. Moreover, rather than challenging the EPA's interpretation of the statutory language it allegedly violated, SIGECO is claiming the benefit of a regulatory exemption promulgated by the EPA and challenging the EPA's interpretation of that exemption. *See Beazer East*, 963 F.2d at 604–611 (defendant in fair notice case also claimed benefit of regulatory exemption).

With this background in mind, it is now important to discuss how SIGECO has framed the issue before the Court. As stated earlier, SIGECO accepts that the routine maintenance analysis involves a common-sense, fact-intensive determination by the EPA. However, SIGECO emphasizes the import of how frequently similar projects take place throughout industry. For example, SIGECO claims, "EPA public regulations and public pronouncements established that the routine maintenance, repair and replacement provision includes repair and replacement activities that are commonly undertaken in the utility industry when boiler components deteriorate or break." Def.'s Memo. in Support at 12. As expressed in this quote, SIGECO focuses its arguments on "whether activities are commonly undertaken in the utility industry." This frequency factor is only one of many factors in this fact-intensive, multi-factor analysis. In other words, SIGECO admits that it has notice about the nature of the routine maintenance interpretation, but argues that it did not have fair notice about the weight or scope of a single factor within that analysis. In the Court's view, this unduly narrows the inquiry, and puts too much emphasis on one factor when the EPA has repeatedly stated that this is a multi-factor test. The actual issue is whether or not, prior to its projects, SIGECO could have known with "ascertainable certainty" how the EPA interpreted routine maintenance. The frequency factor is just one factor in the analysis. Moreover, from the Court's standpoint, it is also important to note that the EPA is not arguing that whether or not these projects have taken place in industry is never relevant, only that the routine maintenance determination does not "turn" on that factor. *See, e.g.,* Pl.'s Memo in Opposition at 1 ("The exemption *does not turn* on whether the activity is prevalent within the industry as a whole.") (emphasis added). *See also* Pl.'s Memo in Support of Motion for Summary Judgment on the Applicable Legal Test for Routine Maintenance and Thirteen Affirmative Defenses at 11 ("The prevalence of an activity within the utility industry *does not determine* whether the activity is routine."). It is with this perspective that the

Court will proceed with its fair notice discussion.

As the Government notes in its briefs, timing plays a significant role in a fair notice inquiry—the notice that matters in this case is what SIGECO had notice of when it was contemplating and implementing its projects. *See Hoechst Celanese Corp.*, 128 F.3d at 224–30 (holding that defendant did not have fair notice from 1984 until 1989, but did have fair notice from 1989 onward because EPA's regional office directly informed the defendant of its interpretation). SIGECO acknowledged as much in its briefs: "Of course, what matters are the agency's statements and actions before the alleged violation, not afterward." Def.'s Memo in Support at 9. Because of this, and because the Government has challenged projects that occurred in different years, the Court will first discuss the notice available to all three projects, and subsequently evaluate the public statements made by the EPA after the 1991 and 1992 projects, and before the 1997 project.

### 1. *Notice Available for All Three Projects*

#### a. Notice Provided by the Routine Maintenance Exemption Language

Before turning to the public statements about routine maintenance, the Court must first determine if SIGECO received sufficient notice of the EPA's interpretation "in the most obvious way of all: by reading the regulations." *Gen. Elec.*, 53 F.3d at 1329. Congress defined "modification" broadly as "any physical change ... which increases the amount of any air pollutant emitted ..." 42 U.S.C. § 7411(a)(4). The EPA subsequently promulgated specific exceptions to the modification provisions:

The following shall not, by themselves, be considered modifications under this part:

(1) *Maintenance, repair, and replacement which the Administrator determines to be routine for a source category ...*

(2) An increase in production rate of an existing facility, if that increase can be accomplished without a capital expenditure on that facility.

(3) An increase in the hours of operation ...

40 C.F.R. § 60.14(e) (1988) (emphasis added). As stated earlier, SIGECO interprets this language to mean that the EPA should look at industry to determine how often similar projects take place at other units. SIGECO argues that this text implies a broad view of routine maintenance because it was not limited to maintenance and repair, but also included *replacement*, and its projects were all replacement projects. It also argues that the ordinary meaning of "routine" includes activities that are "commonplace," "repetitious," or "in accordance with established procedure." (quoting Webster's Ninth New Collegiate Dictionary at 1027 (1990)). Consequently, according to SIGECO, all of its projects are exempt because they are commonplace in the industry. *See* Def.'s Memo in Support at 13. The EPA, on the other hand, argues that the language of the rule puts the regulated community on notice that the "the exemption applies only to activities that are routine for a generating unit" and that it "does not turn on whether the activity is prevalent within the industry as a whole." Pl.'s Memo in Opposition at 1.

The Court finds the language of the exemption ambiguous, and cannot conclude that the EPA's interpretation would be "ascertainably certain" to people of good faith solely based on its text. First, rou-

tine maintenance, repair, and replacement is not defined by the EPA in the regulations. Second, the language of the NSPS exemption mentions projects that are routine "for a source category." This could imply that the EPA will center its analysis on, as SIGECO argues, whether projects are undertaken frequently throughout industry. Or the language could mean that the focus will be on, in this case, the utility industry rather than, for example, the projects taking place in the pulp industry. Either way, the "for a source category" language seems to imply that the EPA will look beyond the unit itself to determine if a project qualifies for routine maintenance. This is not to say that the EPA's multi-factor, common sense test that considers how often similar changes have taken place at the unit itself is inconsistent with the text or unreasonable—it is reasonable, especially factoring in the lofty goals of the CAA. However, it would be difficult for a regulated party to know with "ascertainable certainty" from this brief clause how the EPA would interpret the routine maintenance exemption and apply it to industry projects.

On the other hand, the context of the exemption does provide SIGECO and the regulated community with some notice that the EPA does not interpret routine maintenance broadly. As discussed earlier, Congress sweepingly defined modification as "any physical change" at an existing facility, and the goal of the CAA was "to speed up and intensify" the war against pollution. Moreover, the D.C. Circuit rejected the EPA's earlier attempts to make broad, categorical exclusions from the CAA's definition of modification. *See Ala. Power v. Costle*, 636 F.2d 323 (D.C.Cir.1979) (striking down EPA's exemptions from the CAA definition of "modification" for sources that emit less than fifty tons of pollutants per year, and for physical changes that do not qualify as

"major" as beyond EPA's authority). With this regulatory context in mind, a context that a sophisticated entity like SIGECO was surely aware of, it would be inconsistent for the EPA to broadly define a regulatory exemption that would delay application of NSR to existing sources.

SIGECO's interpretation of routine maintenance is broad in this sense: it focuses the inquiry on one factor, and interprets that factor in a way that could lead to exempting numerous projects as routine maintenance. If the "prevalent or commonplace in the industry" standard was the EPA's interpretation, then a regulated party would only have to point to other similar projects in industry to show that they take place elsewhere to avoid the strictures of NSR. The end result could be many industry projects qualifying for routine maintenance just because others in the industry have taken on similar projects, projects that may or may not have been subject to NSR for various reasons. The comparisons could be misleading for a simple reason: perhaps many companies have made "major modifications" at their facilities. The EAB made a similar conclusion in the *TVA* enforcement action: "[I]t is the frequency of the activity at other individual units within the industry that seems to us most relevant in this context. The mere fact that a number of different facilities within an industry may have undertaken these projects strikes us as less instructive with respect to whether a project under review should be considered 'routine,' than the observation that this kind of replacement is, for an individual unit, an usual or once or twice-in-a-lifetime occurrence." *In re TVA*, at *25. In sum, this focus on whether or not projects are prevalent throughout industry could lead to exempting numerous expensive and complex projects, a result that strains the meaning of the word "routine," and clashes

with the guidance gleaned from the regulatory context. *See* Def.'s Memo in Support at 13 ("commonplace," "repetitious," "in accordance with established procedure").[13]

The Court concludes that the plain language of the routine maintenance exemption itself does not provide "ascertainable certainty" about how the EPA interprets the routine maintenance exemption. Reading the regulation in context, however, gives notice that the regulation will not be construed broadly. The Court considers this inconclusive as to whether or not SIGECO knew with "ascertainable certainty" how the EPA interpreted routine maintenance. As a result, the Court will now consider whether any public statements by the EPA clarified to SIGECO how the EPA interpreted routine maintenance prior to its projects.

### b. The WEPCO Decision

Probably the most important public statement by the EPA on routine maintenance came in the Seventh Circuit's decision in WEPCO. *See WEPCO,* 893 F.2d 901.[14] Wisconsin Electric was contemplating extensive renovations at five units at its electric plant on Lake Michigan north of Milwaukee in the 1980s to avoid shutting down the plant. *See WEPCO,* 893 F.2d at 905–06. In accordance with state law, Wisconsin Electric submitted a proposal to the Wisconsin Public Service Commission about its project. *See id.* The Public Service Commission consulted with the Wisconsin Department of Natural Resources, which in turn consulted with the EPA to determine whether the company needed to obtain a PSD permit prior to commencing the repair and replacement program. *See id.* The EPA contacted Wisconsin Electric to gain additional information about the project and, based on this information, the EPA preliminarily concluded, in a memorandum from Don Clay ("Clay Memo"), that the project would subject the plant to both NSPS and PSD requirements. *See id.* Significantly for this case, the Clay Memo dismissed WEPCO's contention that the project was routine and therefore exempt from PSD and NSPS requirements. *See id.* The Clay Memo was adopted *in toto* by EPA Administrator Lee M. Thomas. *See id.*

Arguing that the EPA misconstrued the CAA and its regulations, Wisconsin Electric appealed this final EPA determination to the Seventh Circuit. Giving deference to the EPA's interpretation of its own regulations, the Seventh Circuit concluded that the EPA's examination of the cost, magnitude, nature, and frequency of the proposed repairs and renovations to determine that the project would not qualify for routine maintenance was not arbitrary or capricious.[15] *See WEPCO,* 893 F.2d at 913. Quoting the Clay Memo, the Seventh Circuit stated: "[T]o determine whether proposed work at a facility is routine, 'EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other factors, to arrive at a common-sense finding.'" *Id.* at 910. This language in the Clay Memo, and the Seventh Circuit's validation of the EPA's interpretation in WEPCO, put the regulated community on

---

**13.** The Court notes that SIGECO does not include "ordinary" or "habitual" when it defines routine, which are included in many dictionary definitions of the word.

**14.** The actual EPA public statement was the Clay Memo, which the Seventh Circuit reviewed in WEPCO.

**15.** Though not relevant to this motion, the Seventh Circuit also concluded that the EPA improperly relied on assumed continuous operations as a basis for finding an emissions increase which would subject the plant to PSD standards after the repairs. *See WEPCO,* 893 F.2d at 918.

notice that the routine maintenance exemption was a multi-factor test, and that no one factor would have dispositive weight. Again, although SIGECO expressly admits that routine maintenance entails a fact intensive analysis, its arguments imply that the interpretation "has a singular focus, that being whether the activity had been undertaken somewhere else within an industry." *In re TVA* at *34. As the EAB observed in *TVA*, the Seventh Circuit considered the frequency factor, but it did not stop there—it continued on to consider other relevant factors. *See id.* at *24.

With regard to the frequency factor, the WEPCO project was apparently very unusual both at Wisconsin Electric, and throughout industry. The Seventh Circuit (quoting from an EPA document) commented:

> In addition, the EPA noted that far from being routine, the Port Washington project apparently was unprecedented: "WEPCO did not identify, and EPA did not find, even a single instance of renovation work *at any electric utility generating station* that approached the Port Washington life extension project in nature, scope or extent." Respondent's [EPA/Government] Brief at 44; *see* Clay Memorandum at 4 ("[T]his is a *highly unusual, if not unprecedented,* and costly project.").

*WEPCO*, 893 F.2d at 911 (emphasis added). The Seventh Circuit also touched on the frequency factor when it quoted a letter written by WEPCO:

> '[T]he renovation work items included in this application are those that would normally occur only once or twice *during a unit's expected life cycle.*' [SIGECO Cassidy Letter at 1]. Indeed, WEPCO reported that it had never previously replaced a steam drum or 'header' of comparable size *at any of its coal-fired electrical generating facilities.* Clay Memorandum at 5 ... These factors suggest that the project is not routine. *Id.* at 912. (Emphasis added).

The first block quotation above suggests that the EPA and the Seventh Circuit were persuaded by the fact that the "massive like-kind replacements" WEPCO was contemplating were unprecedented, and thus infrequently done, *throughout the utility industry.* However, the second block quotation bolsters the Government's interpretation that it is significant how frequently a repair project is done *at a particular unit.* Thus, WEPCO supports the view that the frequency of the project at the particular unit and the frequency of the project within industry are *both* relevant considerations.

1. *Comparison of WEPCO Project to SIGECO's Projects*—SIGECO also compares its projects to the WEPCO project to suggest that its projects were so much smaller than WEPCO that the landmark decision did not give it any notice about the scope of routine maintenance. The WEPCO project involved the replacement of sixty-foot steam drums and air heaters during successive nine-month outages at four units, and the work cost at least $70.5 million. The work also extended the life expectancy of the plant significantly. This project was unprecedented at WEPCO, and apparently also throughout industry.

SIGECO's projects, especially the 1991 and 1992 projects, were comparatively modest. The 1991 project involved the replacement of an economizer at Unit 1. It was the first time an economizer had been replaced at Unit 1, which went into operation in approximately 1955. The project cost about $575,000 and required a four-week outage to complete. The economizer replacement required approval of the Plant Manager, the Director of Power Production, and the company President.

The 1992 project involved the replacement of a secondary superheater. The secondary superheater is a large, tubular heat exchanger that contains two long sections of pipe called an inlet and outlet header. The outlet header, approximately thirty-three to thirty-five feet long, was experiencing an extremely high failure rate prior to its replacement. The replacement cost about $1,015,000 and required a four-week outage to complete.

The 1997 project was by far the largest of SIGECO's projects at issue in this case. A May 1997 work order described what the project entailed: "(1) replacement of superheater outlet; (2) replacement of the reheater outlet; (3) install aero-derivative high pressure-intermediate pressure turbine; (4) replace boiler feed pump element; (5) replace low pressure turbine buckets; and (6) installing retractable packing in the turbine." It was the first time the reheater outlet had been replaced since the Unit began operating in 1973. SIGECO's Vice President of Power Production concluded that future reliable operations at Unit 3 were in jeopardy prior to the project. The project cost $17 million and the outage length was ten weeks. SIGECO's parent, SIGCORP, referred to the project in its 1997 Annual Report to shareholders as a "major refurbishment."

Despite the size differential between the WEPCO project and SIGECO's projects,[16] nothing in WEPCO suggests that any project smaller than WEPCO will automatically qualify as routine maintenance, or that WEPCO was some type of baseline for companies to compare its projects to in efforts to determine if they would qualify

for routine maintenance. Rather, WEPCO was an easy case on routine maintenance—the EPA and the Seventh Circuit quickly disposed of the defendant's arguments that it qualified for routine maintenance. In fact, the EPA concluded that "*all of these [routine maintenance] factors* suggest that the work required under WEPCO's life extension project appears not to be 'routine.' The available information indicates that the work proposed at Port Washington is *far from* being a regular, customary, or standard undertaking for the purpose of maintaining the plant in its present condition." Clay Memo, Pl.'s Ex. 2 (emphasis added). Many factors in WEPCO suggested that the project was nothing close to routine: the four successive nine-month outages required to complete it; the fact that it was replacing sixty-foot drums and air heaters; WEPCO's own admission that it was not completed during normally-scheduled outages; the fact that WEPCO had never undertaken a project on such a scale at any of its utility stations; WEPCO's concession that the project would extend the life of the plant until 2010; and the $70.5 million cost. *See WEPCO*, 893 F.2d at 910–12. Accordingly, WEPCO is significant because it expresses the EPA's interpretation of routine maintenance and illustrates how the EPA applies it to a particular project. But comparing the nature of the WEPCO project to SIGECO's projects to suggest that SIGECO did not have fair notice of the EPA's interpretation of routine maintenance is unpersuasive because the EPA never indicated that WEPCO was a measuring stick for routine maintenance.

**16.** The one project that SIGECO compares its projects to that was actually exempted by the EPA as routine maintenance was Mobil Oil's 1988 project. Def.'s Ex. 10. However, the one-page non-applicability letter does not construe routine maintenance. It simply informed the applicant that the replacements at

issue were not subject to NSPS because they were routine maintenance. The Clay Memo, which was issued around the same time, was the EPA's official interpretation of routine maintenance, and the Court will rely on this official interpretation.

The Court recognizes that the test the EPA urges in this case is slightly more specific than the way the EPA defined routine maintenance in WEPCO. It is more specific in that it alerts the regulated community that the inquiry does not turn on whether an activity is prevalent within industry as a whole. SIGECO, however, can claim no surprise at this because the Clay Memo made it clear that no one factor would be dispositive of the analysis. It also is more specific in the sense that the EPA states "the exemption applies only to activities that are routine for a generating unit." Although the Clay Memo did not explicitly state this, the analysis in the Clay Memo gave the regulated community sufficient notice that the EPA considered how often an activity takes place at a unit to be a significant factor.

**2. *The Clay Memo*—**The Clay Memo, which was the EPA's official response to Wisconsin Electric's request for an NSR applicability determination, stated, "This memorandum provides a framework for analyzing the proposed changes at [WEPCO] and gives EPA's views on relevant issues of legal interpretation. It should also be useful in assessing other so-called 'life-extension' projects in the future." Pl.'s Ex. 2 at 2. Thus, the Clay Memo expresses the EPA's view on issues surrounding NSR determinations, and was clearly intended as a public statement to the regulated community about how it interpreted the CAA and accompanying regulations like the routine maintenance exemption. In its PSD analysis, the EPA rejected Wisconsin Electric's argument that its project was routine:

> In determining whether proposed work at an existing facility is "routine" EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a

common-sense finding. In this case, all of these factors suggest that the work required under WEPCO's life extension project appears not to be "routine." The available information indicates that the work proposed at Port Washington is far from being a regular, customary, or standard undertaking for the purpose of maintaining the plant in its present condition. Rather, this is a highly unusual, if not unprecedented, and costly project.... *The most important factors that would support these conclusions are outlined below* .... c. The work called for under this project is rarely, if ever, performed. The WEPCO's application to the PSC asserted that work to be performed under the life extension project was not frequently done: *"Generally, the renovation work items included in this application are those that would normally occur only once or twice during a unit's expected life cycle."* The EPA asked WEPCO to submit information regarding the frequency of replacement of steam drums, the largest category of work item called for under the project. *WEPCO reported that to date, no steam drums have ever been replaced at any of its coal-fired electrical generating facilities.*

Clay Memo at 3–5, Pl.'s Ex. 2 (emphasis added). Thus, the EPA notified WEPCO and the regulated community that one of the "most important factors" that led it to conclude the WEPCO project was not routine was the fact that the project "would normally occur only once or twice during a unit's expected life cycle" and that WEPCO had never replaced a steam drum at any of its facilities. With regard to NSPS, the EPA also concluded that the changes were nonroutine, citing the PSD analysis as its rationale. *See* Clay Memo at 10 ("As with PSD, the NSPS regulations exclude routine maintenance, repair, and replace-

ment. However, the renovations at the Port Washington steam generating units are not routine for NSPS purposes for the same reasons—detailed above—that they are not routine for PSD purposes."). The quoted language above put the regulated community on notice that how frequently projects occur in a unit's expected life cycle was a very significant factor in the routine maintenance inquiry.

Moreover, the Clay Memo also explicitly notified the regulated community that the EPA considered routine maintenance to be a narrow exemption. After noting the broad definition of modification, the EPA continued: "This wide reach is demonstrated by the *very narrow exclusion* provided in the regulations: other than certain uses of alternative fuels not relevant here, only 'routine maintenance, repair and replacement' is excluded from the definition of physical change." Clay Memo at 3. This 1988 EPA description of routine maintenance as a "very narrow exclusion" illustrates that the EPA's current view of routine maintenance is not a "new" interpretation that the EPA set forth for the first time in this litigation.

A 1989 letter authored by the UARG, representing numerous members of the utility industry, confirms that the regulated community understood how the EPA interpreted routine maintenance in the Clay Memo. This letter was sent by UARG to the DOE and it discussed what UARG regarded as problems associated with the EPA's analysis of the WEPCO projects in the Clay Memo. UARG stated:

> EPA's decisions acknowledge that "routine" repairs and replacements are not subject to the NSPS and PSD modification rules. However, the Agency has arbitrarily redefined what repair and replacement activities are, such that "routine" activities include only those that (1) *are frequently done at that plant,* (2)

involve no major equipment, (3) are inexpensive, and (4) do not extend the life of a plant. This new interpretation is vastly different from past implementation of the "routine" rule, which included any repair and replacement activity that is normal business practice.

Pl.'s Ex. 73 at UARG1 0000095 (emphasis added). The language quoted above, especially the "are frequently done at that plant" quote, evidences that industry had notice of the narrow, unit-focused interpretation of routine maintenance that the EPA urges in this case. Moreover, the letter was written in 1989, before all of SIGECO's challenged projects. Although the Court has insufficient information to know if SIGECO was a member of the UARG at the time the letter was written, it strains credulity to think that a large, sophisticated utility company like SIGECO would not have been aware of this letter (and more importantly, aware of EPA's interpretation of routine maintenance, as expressed by the utility companies in the UARG). This is especially true when SIGECO maintains that it was aware of numerous other statements made in the past about routine maintenance and the NSR programs.

The majority of the evidence SIGECO relies on does not construe the routine maintenance exemption. For example, SIGECO finds compelling the following language in a GAO report about the effect of WEPCO:

> According to EPA policy officials, *WEPCO's life extension project is not typical of the majority of utilities' life extension projects, and concerns that the agency will broadly apply the ruling it applied to WEPCO's project are unfounded. The officials noted that many life extension projects do not result in increased emissions, while other activities are routine in nature and thus exempt from*

*the modification rule.* Lending evidence to the officials' statements, EPA's 1989 emission forecast assumed that the WEPCO decision would not result in a significant number of additional power plants' having to comply with the NSPS and the PSD program requirements. Def.'s Ex. 20 at SIG 342366 (emphasis added). This language says little, if anything at all, about the EPA's interpretation of routine maintenance. It was obvious to both the EPA and the regulated community that Wisconsin Electric's project was massive and unprecedented rather than typical and commonplace. The report cites two reasons the WEPCO ruling would not be applied broadly: (1) because many projects do not result in increased emissions; and (2) because other projects qualify for routine maintenance. The letter does not construe the routine maintenance exemption; it simply reaffirms WEPCO and explains why the EPA did not think it would not affect most utilities. Moreover, as the Government argues, even if it did, it is an anonymous statement that does not purport to give the EPA's official view.

SIGECO also finds significant another statement from an EPA official about how WEPCO would be applied. In a June 19, 1991, letter from William Rosenberg, then Assistant EPA Administrator, to Senator John Dingell, Rosenberg stated: "EPA's WEPCO decision only applies to utilities proposing 'WEPCO type' changes, i.e., nonroutine replacement that would result in an actual emissions increase. This is the basis for the EPA statement that the

ruling is not expected to significantly affect power plant life extension projects." *Id.* ¶ 22. Like the statement in the GAO report, this statement does not construe routine maintenance, and consequently does not have a bearing on whether SIGECO had fair notice of the EPA's interpretation of fair notice.[17]

### 2. Additional Notice After the 1992 Project

There were two additional public statements on the scope of the routine maintenance exemption that may have affected SIGECO's notice for the 1997 project: a 1992 statement in a Federal Register Preamble, and IDEM's non-applicability decision for SIGECO's 1997 project.

#### a. Preamble from Federal Register

The guidance that the EPA provided in the Federal Register[18] is a public statement by the EPA on the routine maintenance exemption. In the preamble to a 1992 amendment to the NSR regulations, the EPA stated:

A few commenters requested that EPA define or provide guidance on 'routine repair, replacement, and maintenance' activities. The June 14 proposal did not deal with this aspect of the regulations, nor do the regulatory changes promulgated today. However, the issue has an important bearing on today's rule because a project that is determined to be routine is excluded by EPA regulations from the definition of major modification. For this reason, EPA plans to issue guidance on the subject as part of a NSR regulatory update package which

**17.** Similarly, the 1996 EPA letter to Senator Byrd does not construe the routine maintenance exemption, nor does it imply that the EPA would be changing the interpretation it set forth in the Clay Memo and WEPCO.

**18.** As the Government points out, the Federal Register preamble language that SIGECO

cites as proof that the EPA had a broader interpretation of the routine maintenance exemption was not promulgated until June 1992, after both the 1991 and 1992 projects were complete. Thus, SIGECO's reliance on this language as affecting its notice for the 1991 and 1992 projects is misplaced.

EPA presently intends to propose by early summer. *In the meantime, EPA is today clarifying that the determination of whether the repair or replacement of a particular item of equipment is 'routine' under the NSR regulations, while made on a case-by-case basis, must be based on the evaluation of whether that type of equipment has been repaired or replaced by sources within the relevant industrial category.*

Pl.'s Ex. 24 at 2 (emphasis added). The only insight that this routine maintenance clarification provides about the frequency factor is contained in the last five words of the paragraph: "within the relevant industrial category." "Relevant industrial category" presumably refers to the utility industry in this case, and informs a utility company that whether or not a project is undertaken at another utility plant is more instructive than whether a project was undertaken at, for example, a textile plant. As SIGECO argues, it refers to a comparison within the relevant industry, and does not specifically mention the significance of whether or not a project has been undertaken at a particular unit. However, because it is so brief, and because it was contained in a preamble to regulatory changes that had nothing to do with routine maintenance, the preamble language does not clarify much about the frequency factor, and certainly does not indicate to the regulated community that the EPA meant any change from the interpretation it advanced in the Clay Memo.

### b. IDEM's 1998 Non–Applicability Determination

In January 1998, IDEM sent SIGECO a letter confirming that its project in 1997 would not trigger CAA requirements under either PSD or NSPS. IDEM specifically exempted the project as "like-kind" replacement for purposes of PSD, and "routine maintenance" for purposes of NSPS. SIGECO attributes great weight to this non-applicability determination in arguing that it did not have fair notice of the EPA's interpretation of the routine maintenance exemption. IDEM's non-applicability determination is troubling, especially because it specifically exempts the project from NSPS as routine maintenance (although it does not exempt the project from PSD as routine).[19] Confusion within the enforcing agency as to the proper interpretation of a regulation is relevant evidence that suggests lack of fair notice. For example, in *General Electric*, the D.C. Circuit observed, "it is unlikely that regulations provide adequate notice when different divisions of the enforcing agency disagree about their meaning." *Gen. Elec.*, 53 F.3d at 1332. *See also Rollins*, 937 F.2d at 653 (observing that "significant disagreement existed between EPA's regional offices regarding the proper interpretation of language.").

However, timing plays a vital role in the fair notice inquiry. It seems anomalous for SIGECO to recognize that the only statements relevant to the fair notice inquiry are an agency's public statements made before the alleged violation, and subsequently rely so heavily on a non-applicability determination that came after it had completed its project. To comply with the NSR programs, permits are required before the construction begins.

---

**19.** The testimony of the state EPA officials also is troubling because it suggests that there has been a lack of communication or agreement between the EPA and its state partners about the NSR program. However, the officials speak in generalities about how the EPA has changed its interpretation of routine maintenance, and do not provide the Court with any concrete, public statements about routine maintenance prior to the commencement of SIGECO's projects.

Thus, if SIGECO was in violation of the NSR permitting programs, it would have been in violation when it started construction without a permit in 1997.[20] The non-applicability letter did not arrive until 1998. As SIGECO itself stated, "[a]t issue in this Motion is whether the EPA regulations and other public pronouncements made *before* the Projects (the last of which was completed in 1997) were performed gave SIGECO fair notice of EPA's current view." Def.'s Memo in Support at 11 (emphasis added by Defendant). SIGECO acknowledged as much at another point in its Memo in Support: "Agencies bear the responsibility of making their rules 'ascertainably certain' and are forbidden from enforcing them until they have done so. Of course, what matters are the agency's statements and actions before the alleged violation, not afterward." Def.'s Memo in Support at 9. As the Government argues, "Because these statements were received after SIGECO's violations began, they could not have led the defendant astray." Pl.'s Opposition Memo at 5. Furthermore, the non-applicability letter is inaccurate legally in that it exempts the project from the PSD requirements as "like-kind." There is no "like-kind" exemption from the NSR programs. It is difficult for SIGECO to argue that it did not know that "like-kind" projects were not exempt because the WEPCO project was considered to be "like-kind" replacement, and the EPA and the Seventh Circuit did not discuss any

"like-kind" exemption from PSD when analyzing WEPCO.

SIGECO also argues that the Government's expert report for the present litigation, prepared by Alan Michael Hekking (the "Hekking" report), demonstrates that the EPA has changed its position on routine maintenance. Def. Memo in Support at 11–12. However, Hekking generally used the WEPCO factors to support his conclusions. As the EPA informed the regulated community in 1990, the "EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other factors, to arrive at a common-sense finding." Notably, the EPA did not limit the factors considered for a routine maintenance determination to the named factors—the Clay Memo adds "as well as other factors." Regardless, the facts that Hekking used to support his conclusions fall under the general categories of the nature, extent, purpose, frequency, and cost of the work. Moreover, the Government expert's conclusion that SIGECO's projects were nonroutine does not resolve that issue—that will be decided by the Court or the factfinder in this case. The Hekking report does not illustrate that the EPA has changed its interpretation of routine maintenance.

 At bottom, SIGECO, which calls the EPA's test *"ad hoc"* and "less-than-well-defined," asks too much of the fair notice doctrine. Def.'s Memo in Support at 11. Nothing in the fair notice case

---

**20.** The Court addressed a similar timing issue in a previous Order in this action: "According to the Government, owners and operators are required—before commencing construction—to project or predict the post-project emissions rate to determine whether a permit is required. Based upon the language of the Act and its implementing regulations, the Court agrees with the Government.... [T]he Court concludes that the issue of whether SIGECO's projects required a preconstruction permit must be determined by reviewing evidence of the projected post-project emissions increases, and not by reviewing evidence of the actual post-project emissions data." Docket No. 307. These NSR requirements are *preconstruction* requirements, and a company that begins construction that will trigger NSR is in violation of the CAA.

law or void-for-vagueness case law indicates that a fact intensive, case-by-case test is prohibited by the due process clause. *See, e.g., United States v. Thomas,* 864 F.2d 188, 198 (D.C.Cir.1988) (interpreting the Due Process clause to require complete precision "would likely invalidate most criminal statutes and administrative regulations"). In fact, the EPA's common-sense determination is especially appropriate in the utility industry where companies take on numerous, factually distinct projects. SIGECO made no inquiry about its 1991 or 1992 projects and assumed that the projects were routine maintenance, relying on statements that said little or nothing about the EPA's interpretation of routine maintenance. SIGECO's inquiry about the 1997 project came too late. The fair notice doctrine does not save parties who take calculated risks. *See Hoechst Celanese,* 128 F.3d at 224 (quoting *Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 1857, 100 L.Ed.2d 372 (1988)) ("A claim of lack of notice 'may be overcome in any specific case where reasonable persons would know their conduct is at risk.' ").

In *General Electric,* a leading fair notice case from the D.C. Circuit, the court summarized some of the major fair notice cases from that Circuit and concluded, "As in *Gates & Fox* and *Satellite Broadcasting,* we conclude that the [agency's] interpretation is so far from a reasonable person's understanding of the regulations that they could not have fairly informed [the defendant] of the agency's perspective." *Gen. Elec.,* 53 F.3d at 1330. In *Rollins,* a case where the court deferred to the EPA's interpretation of its own regulation but struck down the violation penalty due to the ambiguity of the regulation, the D.C. Circuit observed that "EPA's interpretation would not exactly leap out at even the most astute reader" and described the regulation as inherently uncertain. *See Rollins,* 937 F.2d at 652–54.[21] In contrast to these cases where the D.C. Circuit refused to affirm a violation because a regulated party lacked of fair warning of the agency's interpretation, the EPA's interpretation of routine maintenance is not "so far" from a reasonable person's understanding of the regulations and public statements on the issue. SIGECO had adequate notice of the EPA's reasonable interpretation from the following sources: the language and context of the exemption; the purpose of the CAA; the Clay Memo; and WEPCO. Indeed, SIGECO conceded from the start that it understood and had notice of the basic formulation of the EPA's interpretation of routine maintenance. Instead, as stated earlier, SIGECO focuses on one factor in the multi-factor analysis and asserts that it did not have notice of the weight that the EPA would give to that factor in this case. If the scope or weight of one enumerated factor in a fact-intensive test is not specifically delineated, a party cannot complain that it did not have fair warning of an agency's interpretation. SIGECO should have known with "ascertainable certainty" that the enumerated factors would be considered in the routine maintenance analysis, and that due weight would be given to each factor. The Court holds that SIGECO had fair notice of the EPA's interpretation of routine maintenance prior to all of its projects.

---

**21.** In *Rollins,* the defendant did not argue lack of fair notice until its reply brief, and the majority held that Rule 28(a)(4), FED.R.APP.P., precluded their consideration of issues not addressed in the parties' initial briefs. *See Rollins,* 937 F.2d at 653 n. 2. Notwithstanding that procedural conclusion on fair notice, the majority still set aside the fine imposed by the administrative court due to the ambiguity of the regulation. *See id.* at 654. In other words, the majority did not consider the fair notice arguments, but nonetheless arrived at the same result that courts reach when they hold that a defendant lacked fair notice.

**Summary**

SIGECO's most compelling evidence that it was not on notice of the EPA's interpretation of the routine maintenance exemption was the inter-agency confusion illustrated by IDEM's non-applicability determination on the 1997 project. However, SIGECO already had completed its 1997 project by the time it received the determination from IDEM, and the notice that matters for the fair notice doctrine are the statements the defendant receives before the alleged violation begins. Accordingly, SIGECO's arguments that the IDEM determination deprived it of notice of the EPA's interpretation of routine maintenance lose force. The Clay Memo and WEPCO's discussion of routine maintenance made it "ascertainably certain" that the EPA would make a case-by-case determination by weighing the nature, extent, purpose, frequency, cost, and other relevant factors, to make a common-sense finding. Further, it also was "ascertainably certain" that no factor would be elevated above the rest and given dispositive weight, and that how often a project occurred in the life of a unit was a significant factor. The 1989 UARG letter confirms that the regulated community understood how the EPA interpreted routine maintenance in the Clay Memo. Therefore, the Court **DENIES** SIGECO's Motion for Summary Judgment on Fair Notice.

**IV. *CONCLUSION***

For the reasons discussed herein, the Court finds that SIGECO had fair notice of the EPA's interpretation of routine maintenance. Thus, the Court **DENIES** SIGECO's Motion for Summary Judgment.