**UNITED STATES of America,**
**Plaintiff,**

**State of New York, State of New Jersey, State of Connecticut, Hoosier Environmental Council, and Ohio Environmental Council, Plaintiff–Intervenors,**

v.

**CINERGY CORP., PSI Energy, Inc., and The Cincinnati Gas & Electric Company, Defendants.**

No. 1:99–cv–1693–LJM–JMS.

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 18, 2007.

Crissy Lyn Pellegrin, Gaylene Vasaturo, Environmental Protection Agency, Chicago, IL, Cynthia Marie Ferguson, Deborah Nicole Behles, James A. Lofton, Jeffrey K. Sands, Katherine Lynn Vanderhook, Larry Martin Corcoran, Richard Mark Gladstein, Sarah Dale Himmelhoch, US Department of Justice, Steven David Ellis, Environmental & Natural Resources, Washington, DC, Thomas E. Kieper, United States Attorney's Office, Indianapolis, IN, for Plaintiff.

Eugene J. Kelly, Jr., Michael Joseph Myers, Robert T. Rosenthal, New York State Attorney General, J. Jared Snyder, Office of the Attorney General, Albany, NY, R. Keith Guthrie, Elizabethtown, IN, Carmel Alicia Motherway, Connecticut Attorney General, Kimberly P. Massicotte, Office of the Attorney General, Hartford, CT, Christine F. Lewis, Christopher D. Ball, Maurice A. Griffin, New Jersey Office of the Attorney General, James A. Murphy, Kevin P. Auerbacher, Mary E. Costigan, Stefanie A. Brand, R. J. Hughes Justice Complex, Jean Patrice Reilly, Jon C. Martin, State of New Jersey, Trenton, NJ, for Plaintiff–Intervenors.

David T. Buente, Frank R. Volpe, Kathryn B. Thomson, Mark D. Hopson, Samuel B. Boxerman, Stephen M. Nickelsburg, Thomas Charles Green, Sidley Austin Brown & Wood LLP, Washington, DC, James A. King, Scott E. North, Porter Wright Morris & Arthur LLP, Columbus, OH, Barbara Fruehling Gambill, Cinergy Services Inc., Cincinnati, OH, Julie L. Ezell, Duke Energy Legal Department, Plainfield, IN, Debra McVicker Lynch, John D. Papageorge, Robert R. Clark, Scott R. Alexander, Sommer Barnard Attorneys, PC, Indianapolis, IN, for Defendants.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT REGARDING FAIR NOTICE DEFENSE

McKINNEY, Chief Judge.

This cause is before the Court on the plaintiff's, United States of America ("USA"), Motion for Partial Summary Judgment on Cinergy's "Fair Notice" Defense (Docket No. 599), and on the defendants', Cinergy Corp., PSI Energy, Inc. ("PSI"), and the Cincinnati Gas & Electric Company ("CG & E") (all three defendants

collectively, "Cinergy"), Cross–Motion for Summary Judgment on Fair Notice (Docket No. 669). The specific issues raised by the cross-motions are whether Cinergy had fair notice of (1) the legal standards to apply to determine whether the routine maintenance, repair or replacement exclusion ("RMRR") of the New Source Review ("NSR") provisions of the Clean Air Act ("CAA") is applicable to a given project, and (2) the legal standards for determining whether a given project will cause a significant emissions increase for purposes of NSR. The parties have fully briefed the issues and this matter is now ripe for ruling.

For the reasons stated herein, USA's motion is **GRANTED** and Cinergy's cross-motion is **DENIED**.

## I. BACKGROUND

USA initiated this lawsuit against Cinergy alleging, *inter alia*, that Cinergy violated NSR[1] provisions when it made physical changes to units at various power plants that constitute "modifications" under the CAA. USA contends that Cinergy violated the CAA when it modified its power plants without first obtaining permits for installing pollution controls as required by the NSR provisions of the CAA. USA alleges

that, pursuant to those provisions, Cinergy was required to obtain a PSD permit from state authorities prior to making a major modification at a power plant. A major modification consists of any physical change that would result in a significant net emissions increase of a pollutant covered by the CAA. *See* 40 C.F.R. § 52.21. Thus, central to this ongoing imbroglio between the parties has been the question of whether the changes that Cinergy made to its power plants constituted modifications. Cinergy has raised as one of its affirmative defenses the issue of fair notice, which is now before the Court.

In their cross-motions, both USA and Cinergy present numerous assertions that they claim are dispositive of Cinergy's fair notice defense. Cinergy does not dispute any of USA's assertions in USA's Statement of Material Facts Not in Dispute. For its part, USA disputes most of Cinergy's assertions as either factually inaccurate or a mischaracterization of facts and contends that Cinergy's assertions are not relevant to the question of fair notice.[2] Pursuant to Local Rule 56.1(e), the Court will accept as true for the purposes of this Order those assertions that have not been disputed and are actually supported by the designated evidentiary materials.[3]

1. NSR includes both the Prevention of Significant Deterioration ("PSD") provisions and the Nonattainment New Source Review ("NNSR") provisions.

2. USA has also moved to strike paragraphs 44 and 51 of Cinergy's Statement of Material Facts in Dispute on the basis that those statements contain irrelevant material under *United States v. Farley*, 11 F.3d 1385, 1390 (7th Cir.1993). *See* USA's Reply Mem., App. A, ¶ IV. While the Court is reluctant to employ the broad stroke of completely striking Cinergy's assertions, the Court notes USA's objection and, pursuant to *Farley*, will not consider the suppositions of Environmental Protection Agency ("EPA") employees to interpret the CAA and to decide the issue of fair notice.

3. The Court notes with some concern the liberties that Cinergy has taken with the recitation of some of the "facts" in its cross-motion. Some of those "facts" are not found in the exhibits upon which Cinergy relies, and even a generous view of the exhibits does not lead to some of the inferences Cinergy attempts to make. Cinergy's actions in this regard have made it necessary for the Court to spend a great deal of time scouring the record in order to "separate the wheat from the chaff," *i.e.*, to cull the actual facts from those that have been mischaracterized or are actually absent from the record. The Court reminds counsel that their ethical obligations extend not just to their clients but to this Court, and cautions counsel to take care in their future representations to the Court because exces-

The relevant facts contained in the exhibits presented by the parties relate to how the RMRR and emissions standards have been historically interpreted by the Environmental Protection Agency ("EPA") and by industry.[4] The Court notes that some of the exhibits were previously examined and discussed by this Court in *United States v. Southern Indiana Gas & Electric Co.*, 245 F.Supp.2d 994 (S.D.Ind.2003) (*"SIGECO"*), as well as by the Seventh Circuit in *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir.1990) (*"WEPCO"*), *reh'g and reh'g en banc denied.* The Court endeavors to be consistent herein.

Of particular significance to this case a September 9, 1988, memorandum written by EPA employee Don R. Clay ("Clay Memo"), Acting Assistant Administrator for Air and Radiation, regarding a proposed renovation project at Wisconsin Electric Power Company ("WEPCO"). *See* Pl.'s Ex. 1, Clay Memo. The Clay Memo was EPA's official response to WEPCO's request for an NSR applicability determination and explained EPA's view on issues surrounding NSR determinations, including the RMRR exemption. *See id.* The Clay Memo explained that "in determining whether proposed work at an existing facility is 'routine' EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a common-sense finding." *Id.* at 3. The Clay Memo is an important benchmark for this case because the parties agree that, with the exception of the projects at units one through three of the Beckjord plant, all of the projects under scrutiny in this case began after the Clay Memo.

In addition, the Court notes the various statements that the EPA has made regarding the RMRR exemption and emissions standards. In 1971, the EPA proposed the RMRR provision as part of its regulations for the New Source Performance Standard ("NSPS") provisions and stated that "[r]outine maintenance, repair, and replacement shall not be considered physical changes." 36 Fed.Reg. 15,704, 15,705 (Aug. 17, 1971); *see also* 36 Fed. Reg. 24,876, 25,877 (Dec. 23, 1971) (incorporating RMRR provision into final NSPS rule). The EPA subsequently incorporated the RMRR provision into its NSR rules in 1974. *See* 39 Fed.Reg. 42,510, 42,514 (Dec. 5, 1974).

On August 18, 1975, the EPA issued an opinion about whether the installation of an electrical turbine generator and the addition of parts to a boiler at a pulp mill would constitute a modification for purposes of NSPS or PSD. *See* Weyerhaeuser Opinion (Pl.'s Ex. 15; Def.'s Ex. 6). In that opinion, the EPA noted that "any physical change which results in increased emissions must be considered a modification for purposes of both NSPS and PSD" and concluded that the RMRR exemption did not apply to the project. *Id.*

In 1978, the EPA's Office of Air Quality Planning and Standards circulated for internal review a draft report entitled "Electric Utility Steam Generating Units: Background Information for Proposed NOx Emission Standards" (Publication No. EPA–450/2–78–005a). *See* Def.'s Ex. 11. The report noted that emission increases "are allowed if such increases are caused by routine maintenance, repair, and replacement. Emission increases are also

---

sive poor practices can lead to disciplinary action or sanctions.

**4.** While the Court has taken note of all of the exhibits, the Court finds it unnecessary for

purposes of this Order to thoroughly discuss the details of each of the exhibits and instead will focus on addressing those exhibits that are relevant and have the most bearing on Cinergy's fair notice defense.

allowed if caused by increases in production rate which can be accomplished without major capital expenditure. Increases in emissions caused by longer operating hours are also exempted from the rule on no emission increase." *Id.* at 5–3. Further, the report concluded that

> [r]replacement of the pulverizer system with a similar system or replacement of component parts of the pulverizer system with similar parts would not be considered a modified source. However, replacement or redesign of the pulverizer system which would substantially change the physical characteristics of the pulverized coal may be a change where modification regulations apply.

*Id.* at 5–4 to 5–5. Finally, the report explained that "major redesign" of the components of the steam generation system (including the feedwater treatment system, watertubes, economizer, and superheat and reheat sections) would "cause a source to be evaluated to determine if modification regulations should apply" but that mere maintenance would not be a modification. *Id.* at 5–5. There is no indication that this draft report was circulated outside of the EPA or that the report was intended to be an "official" statement.

Additional internal memorandum dated October 2, 1978, and May 11, 1979, from Edward E. Reich, Director of the Division of Stationary Source Enforcement, also shed light on how the EPA was interpreting the RMRR exemption and standards for increased emissions prior to the Clay Memo. *See* Def.'s Exs. 12–13. The first letter was written to Howard G. Bergman, Director of the Enforcement Division for Region VI, and explained that "routine replacement means the routine replacement of parts" and does not include the replacement of an entire facility, such as replacing a part that has ended its normal useful life. *See* Def.'s Ex. 12. The second letter was written to Stephen A. Dvorkin, Chief of the General Enforcement Branch for Region II, and addressed a request for examples of repairs and replacements that would qualify as routine. *See* Def.'s Ex. 13. Reich explained in that letter that the EPA "would prefer to address this question as it applies to a particular source. In general, however, routine replacement means the replacement of parts, within the limitations of reconstruction, and would certainly not include the replacement of an entire 'facility' as that term is defined in § 52.21(b)(5)." *Id.*[5] Reich also noted that for reconstruction efforts there was an exemption from the air impact analysis requirements "if a modification will result in no net increases in emissions and no adverse air quality impact will occur." *Id.*

Thereafter, in June 1979, the EPA sent a letter to industry requesting public comment on proposed regulatory action affecting the non-metallic mineral processing industry. *See* Def.'s Ex. 14. EPA advised that an existing plant would not be covered by the proposed regulation unless "it undergoes a major modification or reconstruction." *Id.* Enclosed with the letter was "Enclosure 2" which explained the term "modification" and "reconstruction." *Id.* A modification was defined as "a physical or operational change which increases the amount of air pollution emitted by an existing facility." *Id.* Furthermore, Enclosure 2 indicated some examples of things that would not be considered modifications, such as routine maintenance and repair and "replacement of old equipment with new equipment of the same capacity." *Id.* Enclosure 2 also revealed that "recon-

---

5. The regulation at that time defined "facility" as "an identifiable piece of process equipment." *See* 40 C.F.R. § 52.21(b)(5) (as quoted in *Ala. Power Co. v. Costle,* 606 F.2d 1068, 1077 n. 14 (D.C.Cir.1979) (*per curiam*), *superseded on reconsideration,* 636 F.2d 323 (D.C.Cir.1979) (*per curiam* )).

struction" meant "the replacement of components at an existing facility to such an extent that the capital cost of the new components exceeds 50[%] of the capital cost required to construct a comparable new facility." *Id.* The EPA noted that reconstruction would be considered on a case-by-case basis. *See id.*

Following this letter to industry, the EPA proposed an amendment to its regulations applicable to the RMRR exclusion in the Federal Register. Specifically, the EPA publicly stated that "Congress indicated that construction of replacement equipment should be subject to NSR under nonattainment programs without regard to the offsetting reductions." 44 Fed. Reg. 51,924, 51,932 (Sept. 5, 1979). The EPA also stated that pieces of processing equipment in nonattainment areas should be subject to NSR requirements. *See id.*

A final EPA statement of significance is a supplemental PSD applicability determination issued on November 6, 1987, by David P. Howekamp ("Howekamp"), Director of the Air Management Division for Region IX, for a proposed reactivation of a copper mining and processing facility near Casa Grande, Arizona. *See* Pl.-Intervenors' Ex. 1. In that determination, Howekamp noted that after the D.C. Circuit's decision in *Alabama Power Company v. Costle*, 636 F.2d 323 (D.C.Cir.1979) (*per curiam*), the EPA formulated the major modification provisions of the PSD regulations "by focusing the regulatory definitions on actual emissions rather than a source vs potential to emit." *Id.* Howekamp also noted that the EPA "promulgated a narrow and limited set of exclusions" for these regulations "but only to allow for routine changes in the normal course of business." *Id.* Given the extensive nature of the repairs and replacements necessary for the facility, including the replacement of key pieces of equipment, the EPA concluded that the RMRR exemption did not

apply. *See id.* Finally, Howekamp's letter outlined the analysis for determining a net emissions increase, which was described as a "multistep analysis," that focused on a change in actual emissions that would occur from reactivating the plant. *Id.* Because the calculation for this activity was significant, Howekamp noted that a PSD permit would be required for the Casa Grande project "prior to construction." *Id.*

In addition to these materials from the EPA, several of the exhibits reveal Cinergy's knowledge of the RMRR and emissions standards prior to the Clay Memo. First, during the mid–1980s, CG & E representatives attended industry conferences such as those sponsored by the Electric Power Research Institute ("EPRI") to discuss life extension projects. *See* Pl.'s Ex. 8; Dep. of Batdorf at 180 (Pl.'s Ex. 17). Robert E. Batdorf ("Batdorf"), a Rule 30(b)(6) deposition witness for Cinergy, testified that he had attended EPRI conferences and that "routine" could be considered by viewing the industry as a whole and a particular unit. *See* Dep. of Batdorf at 176–89.

Further, a memo prepared by Bechtel Power Corporation for the August 1985 EPRI conference on "Fossil Plant Life Extension" explained that some aspects of life extension projects might not be considered routine repair, maintenance, or replacement and so those projects should be identified as "upgraded maintenance programs" or referred to them as "plant restoration." Pl.'s Ex. 16. This memo also implied that industry should deal with state and local authorities where possible in order to avoid elevating a project "to the status of a national environmental issue." *Id.*

Moreover, by at least 1982, Cinergy was aware that NSR regulations could apply when total annual emissions from a project

exceed a threshold amount even in the absence of an increase in the hourly rate of emissions. *See* Dep. of Pearl at 42–52 (Pl.'s Ex. 24). Specifically, Steven L. Pearl ("Pearl"), a Cinergy engineer responsible for advising plant employees on the applicability of NSR regulations, testified that he was aware that emissions increases were measured on an annual basis rather than an hourly basis. *See id.* at 50–52. Further, based on Pearl's interpretation of the relevant rules was that the determination of an increase in the potential to emit for a modification was based upon "a comparison of past actual to future potential." *Id.* at 43–44.

Thereafter, on November 7, 1988, and following the issuance of the Clay Memo, Pearl and other Cinergy officials held a General Environmental Meeting. *See* Pl.'s Ex. 20. Among other topics, the notes from that meeting reveal that the group discussed the EPA's policy that life extension projects triggered both NSPS and PSD rules. *See id.* The notes reflect the attendees' belief that this policy "could possibly affect [Cinergy's] equipment optimization work." *Id.*

Finally, the Cinergy projects at issue were expensive and characterized as "extensive." Pl.'s Exs. 2, 6, 9, and 12. In fact, one of the projects at the Beckjord plant was hailed as "the first complete renovation of an electric generating unit in the U.S. and is being used as a model for study by utilities in this country and from as far away as Australia." Pl.'s Ex. 10. In spite of the characteristics of Cinergy's projects and the standards for the RMRR exemption and the calculation of increased emissions on an annual basis under NSR regulations, Cinergy did not perform any emissions calculations or apply for any PSD permits prior to beginning the construction of the projects at issue in this case. *See* Dep. of Batdorf at 136–38. Cinergy based its decision on its conclusion

that the projects did not increase the hourly rate of emissions or capacity of a unit. *See id.*

## II. SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir.2003), *reh'g denied.* Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir.1996), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment;

rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir.1996), *cert. denied*, 519 U.S. 1109, 117 S.Ct. 945, 136 L.Ed.2d 834 (1997). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir.1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir.1992). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir.1996), *cert. denied*, 519 U.S. 1115, 117 S.Ct. 957, 136 L.Ed.2d 843 (1997).

### III. *DISCUSSION*

This Court has already determined the applicable test for emissions increases and the governing standard for the RMRR exclusion in its prior Orders of September 8, 2005, and February 16, 2006, respectively.

*See United States v. Cinergy Corp.*, 384 F.Supp.2d 1272 (S.D.Ind.2005) (Docket No. 558), *aff'd*, 458 F.3d 705 (7th Cir.2006), *cert. denied*, — U.S. —, 127 S.Ct. 2034, 167 L.Ed.2d 763 (2007); *United States v. Cinergy Corp.*, Cause No. 1:99–cv–1693–LJM–VSS, 2006 WL 372726 (S.D.Ind. Feb. 16, 2006) (Docket No. 878); *see also Envtl. Def. v. Duke Energy Corp.*, — U.S. —, 127 S.Ct. 1423, 167 L.Ed.2d 295 (2007) (discussing applicable test for emissions increases). The cross-motions currently before the Court do not require the Court to apply these standards but, instead, require the Court to determine whether Cinergy had fair notice of them.

This Court previously outlined the criteria for determining whether a party had fair notice of the EPA's regulations in *SIGECO. See SIGECO*, 245 F.Supp.2d at 1010 *et seq.* As the Court explained therein, a regulated party has fair notice of an agency's interpretation of regulations if, by reviewing the regulations and other public statements issued by the agency, the party is able to identify with "ascertainable certainty" the standards with which the agency expects the party to conform. *Id.* at 1011 (quoting *Gen. Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1329 (D.C.Cir.1995)). The Court makes the inquiry from the perspective of the regulated party and analyzes whether the party could have predicted the agency's interpretation of the regulation at the time of the conduct at issue. *See id.* (citing *U.S. v. Hoechst Celanese Corp.*, 128 F.3d 216, 224–230 (4th Cir.1997)). Several factors are relevant to the question of fair notice, including the plain language of the regulation, other public statements by the agency, the consistency of the agency's public statements, an agency's pre-enforcement efforts to bring about compliance, confusion within the agency as to the proper interpretation, and whether or not a con-

fused party makes an inquiry about the meaning of the regulation. *See id.* at 1011–12 (citations omitted). Because Cinergy has raised the issue of fair notice as an affirmative defense, Cinergy has the burden of establishing a lack of fair notice of the regulations at issue in this case. *See U.S. v. Ohio Edison Co.,* 276 F.Supp.2d 829, 886 (S.D.Ohio 2003).

### A. THE RMRR EXCLUSION

As a preliminary matter, the Court notes that Cinergy contends that it lacked fair notice that the RMRR exclusion rested exclusively on a "frequency at the unit" analysis. However, as the Court previously explained in its February 16, 2006, Order, the Court reads USA's position as advocating a multi-factor test, which is the correct standard. *See Cinergy Corp.,* 2006 WL 372726, *3 (Docket No. 878). Further, the Court notes that Cinergy does not contest that determining whether a project fits the RMRR exclusion is fact sensitive and requires a case-by-case approach. Therefore, the Court finds Cinergy's arguments related to the "frequency at the unit" to be irrelevant and unpersuasive on the issue of fair notice.

■ In addition, the Court is not persuaded by Cinergy's arguments related to a lack of fair notice for the RMRR exclusion as it relates to projects that began after the issuance of the Clay Memo. As this Court determined in *SIGECO,* the Clay Memo "explicitly notified the regulated community that the EPA considered routine maintenance to be a narrow exemption." *SIGECO,* 245 F.Supp.2d at 1019. Further, the language of the Clay Memo and the Seventh Circuit's decision in *WEPCO* "put the regulated community on notice that the routine maintenance exemption was a multi-factor test, and that no one factor would have dispositive weight." *Id.* at 1015–16. (referring to *WEPCO,* 893 F.2d at 910 and 913). Thus, the Clay Memo and *WEPCO* made the

EPA's interpretation of the RMRR exclusion "ascertainably certain" to the regulated community, of which Cinergy was a part. *Id.* at 1024. *See also Ohio Edison Co.,* 276 F.Supp.2d at 889 (finding unavailing defendant's assertion that it lacked fair notice of the RMRR exemption). Indeed, the record reveals that Cinergy was actually aware of the EPA's interpretation as it discussed the potential ramifications of it at a meeting on November 7, 1988. *See* Pl.'s Ex. 20. Cinergy has offered no evidence to persuade the Court differently. Accordingly, the Court concludes that Cinergy had fair notice of the EPA's interpretation of the standards for the RMRR exclusion for all of its projects that began after the Clay Memo, which are most of the projects that remain under scrutiny in this case.

■ The Court must now determine whether Cinergy had fair notice of the EPA's interpretation of the RMRR exclusion for the projects that began prior to the Clay Memo, namely the Beckjord projects at units one through three. The Court concludes that the plain language of the CAA's statutes and regulations, the EPA's official statements and prior interpretations, and Cinergy's failure to make any inquiry prior to construction (such as an applicability determination), reveal that Cinergy did have fair notice of the interpretation of the RMRR exclusion. This conclusion is bolstered by evidence that Cinergy had actual knowledge of the EPA's interpretation.

First, the Court considers whether Cinergy received sufficient notice of the EPA's interpretation "in the most obvious way of all; by reading the regulations." *Gen. Elec. Co.,* 53 F.3d at 1329. The CAA defines the term "modification" broadly as "any physical change ... which increases the amount of any air pollutant emitted...." 42 U.S.C. § 7411(a)(4). As the Seventh Circuit has noted, the potential

reach of this definition is broad and encompasses even the most trivial of activities. *See WEPCO,* 893 F.2d at 905; *see also Ala. Power Co.,* 636 F.2d at 400 (noting that the term modification "is nowhere limited to physical changes exceeding a certain magnitude"). Thus, while this does not conclusively answer the question of fair notice, the potential reach of the CAA to Cinergy's project was obvious from the plain meaning of statutory language.

The potential reach of the regulation is further evident when one considers the narrowness of the RMRR exclusion. As early as 1971, the EPA proposed that "[r]outine maintenance, repair, and replacement shall not be considered physical changes." 36 Fed.Reg. 15,704, 15,705 (Aug. 17, 1971); *see also* 36 Fed.Reg. 24,-876, 25,877 (Dec. 23, 1971). Although the EPA did not provide any further elaboration on the exclusion, as this Court noted in *SIGECO,* the EPA's use of the word "routine" signaled that "unusual or irregular activities may not qualify" for the exclusion. *SIGECO,* 245 F.Supp.2d at 1009 (quoting Environmental Appeals Board's observation); *see also Ohio Edison Co.,* 276 F.Supp.2d at 887–88. Indeed, the D.C. Circuit's decision in *Alabama Power* explained that the EPA did not have authority to create exemptions beyond those that were *de minimis. See Ala. Power Co.,* 636 F.2d at 400. Therefore, while the plain language of the exemption may not have explicitly explained the considerations for the RMRR exclusion, the Court finds that under the circumstances the context of the exemption provided Cinergy and the regulated community with some notice that the EPA did not interpret the RMRR exclusion broadly.[6]

While analysis of the plain language of these regulations provides some indication of the context of the RMRR exclusion, it does not conclusively resolve the fair notice issue; therefore, the Court next considers the various public statements that the EPA has made interpreting the RMRR exclusion. As the D.C. Circuit recently noted, the EPA has historically applied the RMRR exclusion to *de minimis* activities. *See New York v. EPA,* 443 F.3d 880, 888 (D.C.Cir.2006), *reh'g en banc denied; see also Ohio Edison Co.,* 276 F.Supp.2d at 888 (concluding that *Alabama Power* made it "ascertainably certain that only *de minimis* activities would serve to trigger the routine maintenance exemption"). In fact, in a proposed amendment in September 1979, the EPA noted that "Congress indicated that construction of replacement equipment should be subject to NSR under nonattainment programs without regard to the offsetting reductions." 44 Fed.Reg. 51,924, 51,932 (Sept. 5, 1979). Further, the EPA stated that pieces of processing equipment in nonattainment areas should be subject to NSR requirements. *See id.* Thus, this proposed amendment indicated that component replacements would generally violate NSR if they increased emissions.

Moreover, the EPA issued two different applicability determinations applying the RMRR exclusion that bear on the issue of fair notice. The first decision was issued in August 1975 and addressed whether the installation of an electrical turbine generator and the addition of parts to a boiler at a pulp mill would constitute a modification for purposes of NSPS or PSD. *See* Weyerhaeuser Opinion (Pl.'s Ex. 15; Def.'s Ex. 6). The EPA concluded that the exclusion did not apply to the project, in part because "any physical change which results in increased emissions must be considered a modification for purposes of both NSPS and PSD." *Id.* Subsequently, in November 1987, the EPA issued a supplemental ap-

---

**6.** In fact, the decision in *Alabama Power* should have put the regulated community on notice that the EPA could not interpret the exclusion broadly.

plicability determination for the reactivation of a copper mining and processing facility. *See* Pl.-Intervenors' Ex. 1.[7] The EPA concluded that given the extensive repair and replacement needed to reactivate the facility, including the replacement of key pieces of equipment, the RMRR exclusion did not apply. *See id.* The Court finds that these two applicability determinations support a finding of fair notice regarding the RMRR exclusion because they should have alerted Cinergy to the possibility that its extensive replacement and life extension projects probably would not fall within the RMRR exclusion. The Court concludes that official statements from the EPA, when read in conjunction with the plain language of the regulations, put industry on notice of the EPA's interpretation of the RMRR exclusion.

Finally, the Court notes the absence of any evidence that Cinergy, though apparently professing confusion over the meaning of the RMRR exclusion, ever sought an applicability determination prior to beginning construction or inquired about the meaning of the RMRR exclusion. This factor is particularly compelling when one considers the evidence that suggests Cinergy's actual knowledge of the standards and what could arguably be construed as industry's attempt to subvert enforcement efforts. Specifically, Cinergy was aware that whether a project was considered "routine" was based on viewing both the industry as a whole and a particular unit. *See* Dep. of Batdorf at 176–89. Further, a memo presented at the August 1985 EPRI conference advised industry that life extension projects might not be considered routine by the EPA and so efforts should be made to identify those projects as "up-

graded maintenance programs" or "plant restoration" and to deal with state and local authorities in order to avoid elevating a project "to the status of a national environmental issue." Pl.'s Ex. 16. CG & E representatives attended EPRI conferences and even made presentations regarding life extension projects. *See* Pl.'s Ex. 8; Dep. of Batdorf at 180. Finally, the project at unit three at Beckjord was hailed as "the first complete renovation of an electric generating unit in the U.S. and is being used as a model for study by utilities in this country and from as far away as Australia." Pl.'s Ex. 10. The projects were also expensive, required numerous contractors, and were characterized internally as "extensive." Pl.'s Exs. 2, 6, 9, and 12. Thus, Cinergy should have known that its projects were irregular or unusual, and therefore far from what could be considered "routine." The only reasonable inference from this evidence is that Cinergy had actual knowledge of the standards for determining whether a project met the RMRR exclusion.

Cinergy suggests that it did not have fair notice because there was confusion within the agency as to the interpretations for RMRR and the EPA did not try to enforce the regulations or claim any violations of the CAA until it initiated this action. Cinergy's arguments are unavailing. First, Cinergy has not presented sufficient evidence of any internal confusion to rebut a finding that Cinergy had fair notice of the standards for determining the RMRR exclusion. Cinergy's reliance on the 1978 draft report entitled "Electric Utility Steam Generating Units: Background Information for Proposed NOx Emission Standards" (Publication No. EPA–450/2–78–005a), which suggested

---

7. The Court recognizes that the November 1987 supplemental determination is of only marginal utility for determining the question of fair notice for the projects at the Beckjord

plant because some of that work allegedly began before the EPA issued the supplemental determination. *See* Pl.'s Third Am. Compl., ¶ 172

that replacement of a pulverizer system might be permitted, and the July 1979 letter to industry requesting comment on proposed regulatory action is not helpful. *See* Def.'s Exs. 11, 14. With respect to the draft report, there is no indication that it was ever circulated outside of the EPA or meant to be an official statement. Moreover, nothing in the report indicated that all aspects of a "like kind" replacement program or extensive overhauls at plants were permissible. In fact, the draft report explained that "major redesign" of such components as feedwater treatment system, watertubes, economizer, and superheat and reheat sections could trigger the modification provisions. *See* Def.'s Ex. 11. Cinergy's reliance on this strictly internal draft report is further undermined by Director Reich's memoranda issued both before and after the draft report, which reveal that the RMRR exclusion was considered on a case-by-case basis and that replacement of process equipment or parts that have ended their normal useful life do not fall within the exclusion. *See* Def.'s Exs. 12–13. Thus, the 1978 draft report does not detract from the fair notice provided by the plain language of the regulations, the official agency statements, and the evidence suggesting Cinergy's actual knowledge of the regulations. *Accord Puerto Rican Cement Co. v. U.S. EPA*, 889 F.2d 292, 299 (1st Cir.1989) (concluding that reliance on a single determination is inappropriate when "EPA materials written both before, and after, the deviant letter are consistent with the present interpretation").

Likewise, the July 1979 letter to industry requesting comments on proposed regulatory action does not undermine the fair notice to Cinergy regarding the standards for determining whether the RMRR exclusion applied to a particular project. This letter provided some explanation of the terms "modification" and "reconstruction." *See* Def.'s Ex. 14. It also noted examples of things that would not be considered modifications such as routine maintenance and repair and "replacement of new equipment of the same capacity." *Id.* While at first blush this might appear to support Cinergy's position, clear statements before and after this letter put Cinergy on notice that its activities could constitute RR modifications and not fall within the RM exclusion.[8] For example, in September 1979, shortly after the letter was sent to industry, the EPA proposed an amendment to its regulations and noted that Congress intended for construction of replacement equipment to be subject to NSR under nonattainment programs and that pieces of processing equipment in such areas should also be subject to NSR requirements. *See* 44 Fed.Reg. 51,924, 51,932 (Sept. 5, 1979). Moreover, as already noted, the EPA has historically applied the RMRR exclusion to only *de minimis* activities. *See New York v. EPA*, 443 F.3d at 888; *Ohio Edison Co.*, 276 F.Supp.2d at 888. Therefore, the Court finds that despite any confusion that the 1979 letter to industry may have caused, Cinergy still had fair notice of the EPA's interpretation of the RMRR exclusion. *Accord Ohio Edison Co.*, 276 F.Supp.2d at 888 (noting that "it is beyond dispute that a regulation promulgated by an administrative agency is invalid to the extent the regulation conflicts with the language of a statute").[9]

8. Although the Court determines that Cinergy had clear notice despite the content of this letter, if the letter confused Cinergy, the regulations require Cinergy to make an inquiry, and there is not evidence that Cinergy ever made one.

9. Cinergy offers various other exhibits to support its argument of agency confusion; how-

Cinergy's argument related to the EPA's "lack of enforcement" at any of its projects is also ineffectual. This argument bears in part on the defense of estoppel that Cinergy raised in its Answer, a defense that the Court already rejected when it granted USA's request for partial judgment on the pleadings. *See* May 18, 2005, Order on the USA's Motion for Partial Judgment on the Pleadings (Docket No. 412). Further, Cinergy cannot use the EPA's "silence" on its activities to establish that it lacked fair notice. *See Fluor Daniel v. Occupational Safety and Health Review Comm.*, 295 F.3d 1232, 1238 (11th Cir.2002) (finding that government's silence on whether a regulation applied "cannot be construed as a sign of approval" leading a defendant to believe that its conduct was lawful). Finally, this argument ignores the evidence suggesting that Cinergy had actual knowledge of the regulations and yet did not make any preconstruction emissions calculations, apply for any PSD permits, or seek any applicability determinations. *See* Pl.'s Ex 8; Dep. of Batdorf at 136–38. Along with this evidence of knowledge is the troubling suggestion that Cinergy may have acted on industry's apparent advice to subvert enforcement efforts by labeling its projects a certain way and trying to avoid attracting the EPA's attention. *See* Pl.'s Ex. 16. In light of these circumstances, the Court concludes that Cinergy's "lack of enforcement" argument to support its fair notice defense is uncompelling, particularly when the plain language of the statute and official statements are also considered. These circumstances should have made Cinergy aware that its conduct was risky; the fair notice doctrine will not save the company because the doctrine does not save parties who take calculated risks. *See Hoechst Celanese Corp.*, 128 F.3d at 224 (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988)) ("A claim of lack of notice 'may be overcome in any specific case where reasonable persons would know their conduct is at risk.' ").

In summary, notwithstanding Cinergy's arguments to the contrary, the Court concludes that Cinergy had fair notice of the EPA's interpretation of the RMRR exclusion based on the plain language of the regulations, official statements from the EPA, and Cinergy's decision not to seek advice from the EPA prior to beginning construction. There is also evidence suggesting that Cinergy had actual knowledge of the standards. Therefore, the Court finds that USA is entitled to summary

---

ever, the Court finds that none of those exhibits actually assist Cinergy. This includes the conclusions reached by the Indiana Department of Environmental Management ("IDEM"), whose applicability determination for SIGECO was issued *after* Cinergy had already begun construction on most of its projects and is therefore largely irrelevant on the question of fair notice. *See* Def.'s Exs. 65–66; *see also SIGECO*, 245 F.Supp.2d at 1021–22 & n. 20 (addressing this same evidence and noting the "vital role" of timing for fair notice inquiry). The Court is equally unpersuaded by Cinergy's reliance on the EPA's 2003 and 2005 proposed regulations. *See* 68 Fed.Reg. 61,248 (Oct. 27, 2003); 70 Fed.Reg. 61,081 (Oct. 20, 2005). Those proposed regulations are irrelevant because they arose after Cinergy's alleged violations began. *See SIGECO*, 245 F.Supp.2d at 1022 (discounting defendant's attempt to use post-construction non-applicability determination by IDEM for its fair notice defense). Moreover, contrary to Cinergy's assertions, those proposed regulations do not say what Cinergy claims that they do, *i.e.*, that the EPA proposed the regulations to somehow clarify existing regulations. *See* 68 Fed.Reg. 61,248 (Oct. 27, 2003); 70 Fed.Reg. 61,081 (Oct. 20, 2005). Instead, a review of the proposed regulations reveal a proposed shift in policy, one that the D.C. Circuit has reviewed stringently to determine whether it complied with the CAA and the EPA's authority. *See New York v. EPA*, 443 F.3d at 883 *et seq.*; *New York v. EPA*, 413 F.3d 3 (D.C.Cir.2005).

judgment on Cinergy's fair notice defense for the projects at the Beckjord plant.

## B. STANDARD FOR DETERMINING EMISSIONS INCREASES

■ The Court now turns to the question of whether Cinergy had fair notice of the legal standards for determining whether its projects would cause significant emissions increases. As a preliminary matter, the Court addresses Cinergy's assertions that it lacked fair notice because it did not know the precise methodology for calculating emissions increases, including the EPA's alleged "failure to hold hours and conditions of operation constant," and it could not be "ascertainably certain" that its projects would actually trigger NSR requirements. Cinergy's Memo. in Supp. of Cross–Mot. for Summ. J. at 38. The Court is unpersuaded by these assertions.

First, a similar argument regarding the methodology for calculating emissions increases was previously addressed and rejected by the Southern District of Ohio in *Ohio Edison.* There, the district court analyzed the defendant's argument attacking the precision of calculations by experts. *See Ohio Edison Co.,* 276 F.Supp.2d at 878 *et seq.* The district court explained that the real question presented was whether the defendant should have anticipated that its projects would cause a substantial increase in emissions. *See id.* at 878. The district court concluded that as long as the defendant could have predicted that its projects would result in a substantial increase in emissions, the precise computation was not relevant. *See id.* at 880. This Court finds the reasoning in *Ohio Edison* to be equally applicable to Cinergy's fair notice defense. The Court therefore concludes that as long as Cinergy was aware of the regulatory standards for determining whether a project may result in significant increases in emission, its understanding of the exact mathematical formula is irrelevant.

The Court is likewise unimpressed with Cinergy's argument that it lacked fair notice of the increased emissions standards because it could not be "ascertainably certain" that its projects would actually trigger NSR requirements. This argument is somewhat disingenuous because Cinergy never even attempted to make any sort of emissions calculations or apply for any PSD permits prior to beginning the construction of its projects because it concluded that those projects did not increase the hourly rate of emissions or capacity of a unit. *See* Dep. of Batdorf at 136–38. Moreover, the question to be addressed is not whether Cinergy could actually conclude that its projects might run afoul of the CAA; it is whether Cinergy had notice of the applicable standards. If Cinergy was at all unsure pre-construction about whether it needed a PSD, it merely had to seek an applicability determination from the EPA, which it failed to do. Perhaps recognizing this, Cinergy attempts to bolster its position by implying that the EPA's calculations are flawed and by arguing that Cinergy's projects were permissible. But these arguments also fail to assist Cinergy on the issue of fair notice because they are instead arguments that allegedly support Cinergy's claim that it did not violate the CAA. While such arguments may be relevant at trial or on one of the other pending motions for summary judgment, they have no place in the motions currently before the Court.

Having decided that knowledge of the precise calculation methodology is irrelevant, the Court must now consider the broader question of whether Cinergy had fair notice of the standards for determining whether a given project will cause a significant emissions increase. As with the RMRR exclusion, the Court notes that Cinergy certainly had fair notice of the standards after the *WEPCO* decision and for projects it began thereafter. At a

minimum, USA is entitled to summary judgment regarding the fair notice defense on Cinergy's projects that began after *WEPCO*.

Even prior to *WEPCO*, however, the Court concludes that Cinergy had fair notice of the standards for determining significant emissions increases for all of its projects. As with the RMRR exclusion, the Court first examines the plain language of the regulations. The CAA defines a "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411. This section, by its terms, reveals that the focus is on pollutants that are *actually* emitted; otherwise, Congress would have used some other terminology for the definition.

Further, the regulations required Cinergy to obtain a PSD permit prior to making a major modification at one of its power plants. *See* 40 C.F.R. § 52.21. As this Court noted in its Order on Cross–Motions for Partial Summary Judgment Regarding the Applicable Test for Emissions Increases, the 1980 rule defines "major modification" as a change that causes a significant net increase in a unit's "actual emissions." *See Cinergy Corp.*, 384 F.Supp.2d at 1277 (citing 45 Fed.Reg. 52,676, 52,698 (Aug. 7, 1980)); *see also* 45 Fed.Reg. 52,676, 52,735 (Aug. 7, 1980) (amending 40 C.F.R. § 52.21). "Actual emissions" are measured "in tons per year" by using the unit's actual operating hours and production rates. *See* 40 C.F.R. § 52.21(b)(21)(ii) (1980). Thus, this section indicates that emissions are measured on an annual rate and provides notice of the factors that are used for the calculation. Finally, the regu-

lations for 1980 defined the term "significant" by indicating the threshold amount for various listed pollutants. *See* 40 C.F.R. § 52.21(b)(23) (1980). Thus, once the amount of emissions is calculated, a comparison of that amount to this list will reveal whether the amount is "significant."

█ The plain and most logical reading of these various regulations is that, for the NSR program, emissions are based on an annual amount and that a PSD permit is required prior to construction of any physical change that will result in a significant increase of the emissions. When the plain language of a regulation is clear, as it is here, it is normally conclusive as to the meaning of that regulation. *See U.S. v. Ron Pair Ent., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Newsom v. Friedman*, 76 F.3d 813, 819 (7th Cir.1996). Further, the plain language of a regulation can suffice to show fair notice or a lack thereof. *See Gates & Fox Co. v. Occupational Safety and Health Review Comm'n*, 790 F.2d 154, 156 (D.C.Cir.1986) (focusing on the actual language of the regulation at issue to conclude that defendant did not have fair notice of the agency's interpretation). Therefore, because the plain meaning of these regulations was clear, the Court finds that Cinergy should have been on notice of the specific requirements for determining whether its projects could cause significant emissions increases.[10]

The Court's conclusion is supported by events that show Cinergy either had actual knowledge of or should have been aware of the standards. For instance, Cinergy was actually aware that NSR regulations could apply when total annual emissions exceeded the threshold amounts, even in the absence of an increase in the hourly

---

10. The Court notes that this finding is consistent with Congressional intent. *See WEPCO*, 893 F.2d at 904 (noting that Congress added the NSR program in 1977 because it was "concerned with increases in total annual emissions").

rate of emissions, because Pearl testified that this was his understanding of the regulations. *See* Dep. of Pearl at 42–52. Moreover, the EPA's 1987 supplemental PSD applicability determination for the Casa Grande copper mining and processing facility explained that determining whether a significant emissions increase would occur is a multi-step process, and it spelled out this process by reference to the applicable regulatory sections. *See* Pl.-Intervenors' Ex. 1. This document underscored the standards that should have already been known by industry based simply on the plain language of the statute. *See id.*

Of course, the Court does note that prior to *WEPCO* the EPA had been employing an "actual-to-potential" test rather than an "actual-to-projected-actual" test. The EPA based this approach came from its interpretation of 40 C.F.R. § 52.21(b)(21)(iv), which provided for such a test when a unit had not "begun normal operations." *See WEPCO*, 893 F.2d at 916–17. Cinergy seizes upon this fact and argues that it is evidence that Cinergy did not have fair notice of the standards.

■ The Court finds that the EPA's prior application of the wrong test did not deprive Cinergy of fair notice of the standards governing significant emissions increases for the NSR provisions. First, the Court fails to find any harm from this error. Cinergy, while aware of the test that the EPA was using, did not attempt to do any emissions calculations prior to making its modifications. *See* Dep. of Pearl at 43–44; Dep. of Batdorf at 136–38. Further, Cinergy's own witness, engineer Pearl, acknowledged that the "actual-to-potential" test was more likely to result in a finding that a PSD permit was required

because it assumed maximum operation of a unit. *See* Dep. of Pearl at 43, 79–80. Thus, while the test the EPA was using was more rigorous than the one the Seventh Circuit found appropriate in *WEPCO*, had Cinergy made any inquiry it probably would not be facing the allegations at issue in this lawsuit.[11]

But the probable harmlessness aside, Cinergy cannot ignore that the plain language of the regulations nevertheless identified what the proper standards were. Indeed, in 1979 the D.C. Circuit made it clear in *Alabama Power* what the proper standards were when it indicated that projected emissions were not appropriate for projects like Cinergy's. The *Alabama Power* court stated that if "the source is an established operation, a more realistic assessment of its impact on ambient air quality levels is possible, and thus is directed." 636 F.2d at 379. *See also U.S. v. La.-Pac. Corp.*, 682 F.Supp. 1141, 1158 (D.Colo. 1988) (noting that *Alabama Power* "stands for the proposition that hypothesizing the worst possible emissions form the worst possible operation is the wrong way to calculate potential to emit"). Moreover, the D.C. Circuit recently reaffirmed the ruling in *Alabama Power* that the plain language of "modification" requires emissions changes to be based on increases in actual rather than potential emissions. *See New York v. EPA*, 413 F.3d at 39–40 (citing *Alabama Power Co.*, 636 F.2d at 353 and discussing regulatory language). In light of these circumstances, the Court concludes that Cinergy was not deprived of fair notice by the EPA's prior application of a more onerous test.

In summary, the Court finds that Cinergy had fair notice of the standards for

---

11. Indeed, the Court previously reaffirmed that, consistent with the purpose and logic of the PSD permit requirement, an owner or operator of a facility must make a precon-struction projection of whether and how much emissions will increase at a particular unit following construction. *See Cinergy Corp.*, 384 F.Supp.2d at 1276.

determining whether its projects would cause a significant emissions increase for purposes of NSR. Therefore, the Court finds that USA is entitled to summary judgment on Cinergy's fair notice defense.

## IV.  *CONCLUSION*

For the foregoing reasons, the plaintiff's, United States of America, Motion for Partial Summary Judgment on Cinergy's "Fair Notice" Defense (Docket No. 599), is **GRANTED,** while the defendants', Cinergy Corp., PSI Energy, Inc., and the Cincinnati Gas & Electric Company, Cross–Motion for Summary Judgment on Fair Notice (Docket No. 669), is **DENIED.**

Distribution attached.